OA 91  Criminal Complaint

# United States District Court

|  NORTHERN  | DISTRICT OF | CAILFORNIA |

## FILED

UNITED STATES OF AMERICA
V.

SEP 20 2007

CRIMINAL COMPLAINT

EDMUND JEW
1 Dr. Carlton B. Goodlett Place
Room 260
City Hall
San Francisco, CA 94102

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

Case Number:  **3  07  70559**

**EDL**

(Name and Address of Defendant)

I, the undersigned complainant being duly sworn state that the following is true and correct to the best of my

knowledge and belief.  On or about March 14 to May 18, 2007          in  San Francisco                          County, in

(Date)

the  Northern                                      District of   California                                          defendant(s) did,

(Track Statutory Language of Offense)

knowingly and intentionally devise a material scheme and artifice to defraud and deprive the people of the Sunset District, the City and County of San Francisco, and the State of California of their intangible right to his honest services as a member of the Board of Supervisors for San Francisco, and did use the United States mails in furtherance of the material scheme to defraud,

in violation of Title 18                            United States Code, Section(s) 1341 and 1346                            .

I further state that I am a(n)  Special Agent of the FBI                      and that this complaint is based on the

Official Title

following facts:

Please see attached Affidavit, which is fully incorporated by reference herein.

Continued on the attached sheet and made a part hereof:          ☒ Yes          ☐ No

Approved
As To
Form: Michael Li-Ming Wang
       AUSA

SPECIAL AGENT J. CHRISTOPHER McDONOUGH
Name/Signature of Complainant

Sworn to before me and subscribed in my presence,

September 20, 2007
Date

at  San Francisco, California

City and State

HON. ELIZABETH D. LAPORTE          United States Magistrate Judge

Name & Title of Judicial Officer                                    Signature of Judicial Officer

# AFFIDAVIT
# IN SUPPORT OF COMPLAINT

I, J. Christopher McDonough, being duly sworn, state the following:

## I. BACKGROUND

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI") assigned to the San Francisco Field Office. I have been employed as a Special Agent since October 1999 and I am assigned to investigate white-collar crime, including public corruption and civil rights.

2. My law-enforcement training includes sixteen weeks of basic training at the FBI Academy in Quantico, Virginia. That training included instruction in the areas of white-collar crime, mail and wire fraud, public corruption, narcotics, and other violations. I attended a one-week Public Corruption training course at the FBI Academy in 2000. I am also an attorney, with several years of practice experience at a private law firm prior to my law-enforcement career. I have worked on public corruption cases in the San Francisco Division of the FBI since 2000, many of which cases have involved investigation of public officials and individuals who are involved in political lobbying and/or consulting. I have participated in the execution of numerous search warrants and arrests.

3. This affidavit contains information necessary to establish probable cause in support of this Complaint. It is not intended to include every fact known to me or the Government. The information is based on my personal knowledge and observations during the investigation, information conveyed to me by other law enforcement and government officials, and my review of records, documents and other physical evidence obtained during this investigation. Except where specifically indicated, I have personally reviewed all of the records and the reports of interviews referred to in this affidavit.

4. As set forth below, there is probable cause to believe that EDMUND JEW has used the United States mails in furtherance of a scheme to deprive the public of its intangible right to honest services, in violation of 18 U.S.C. §§ 1341 and 1346.

5. I have based the facts set forth in this Affidavit upon on interviews with percipient witnesses and sources; conversations with and reports from other law-enforcement agents; recordings of consensually-monitored meetings and

telephone calls; review of translations of recordings; review of documents; and other tangible items I obtained as part of this investigation. This affidavit contains information that I believe establishes probable cause in support of this Complaint. It is not intended to include each and every fact known to me or the government.

## II. INDIVIDUALS AND ENTITIES INVOLVED

### A.  San Francisco Board of Supervisors

6.      The San Francisco Board of Supervisors is the governing legislative authority for the City and County of San Francisco.  San Francisco is divided into Districts, with residents of each District electing one member of the Board of Supervisors to staggered four-year terms.

7.      District Four, commonly known as the Sunset District, covers the western portion of San Francisco extending from 19th Avenue out to the shoreline of the Pacific Ocean, and from Lincoln Avenue at Golden Gate Park south to Sloat Avenue.

8.      During Fiscal Year 2006–2007, San Francisco received approximately $354 million in federal funds.

### B.  Target of Investigation

9.      Defendant EDMUND JEW is a member of the San Francisco Board of Supervisors, representing the Sunset District.

10.     In November 2006, residents of the Sunset District elected JEW to office.  The Mayor of San Francisco appointed JEW to the Board in November 2006, in advance of JEW's elected term beginning in January 2007.

11.     In addition to serving as an elected representative, JEW owns the Canton Flower Shop, located at 118 Waverly Place in San Francisco's Chinatown neighborhood.  JEW has office space at the Canton Flower Shop.

12.     JEW speaks fluent Cantonese and English.

### C.  Other Individuals

13.     CO-CONSPIRATOR #1 is a self-employed consultant who holds himself out as someone who has inside access to powerful people in City Hall.

14.    VOLUNTEER #1 has worked for JEW on an unpaid basis for approximately the past year. VOLUNTEER #1 worked for JEW's campaign for the Board of Supervisors until JEW's election. Since JEW took office, VOLUNTEER #1 has served as a "community liaison" to JEW. VOLUNTEER #1 has never been on the city government's payroll.

## D.    Quickly Stores

15.    Quickly is a worldwide chain of stores that sell tapioca and milk tea beverages. The worldwide parent company is Kuai Ke Li Enterprise Co. Ltd., headquartered in Taiwan. Quickly maintains a corporate presence in the United States, known as "Quickly USA" and headquartered in Hayward, California.

16.    Quickly operates approximately twelve franchises in San Francisco. These stores are typically small carry-out operations, with limited seating in some locations.

17.    OWNER #1 owns and operates a Quickly store located on Irving Street ("the Irving Street Quickly Store") in San Francisco, in the Sunset District, JEW's legislative district. ASSOCIATE #1 assists OWNER #1 in the operation of this store. OWNER #1 rents the business premises from the owner of the building, LANDLORD #1.

18.    Both OWNER #1 and ASSOCIATE #1 are Cantonese-speaking immigrants who do not speak English. Accordingly, all FBI interviews and debriefings of OWNER #1 and ASSOCIATE #1 were conducted in Cantonese and translated into English.

19.    DISTRIBUTOR #1 is employed by Quickly USA to help supply Quickly franchises with the ingredients for their products. DISTRIBUTOR #1 speaks fluent Cantonese.

20.    PUTATIVE OWNER #1 and PUTATIVE OWNER #2 are owners of small businesses in San Francisco. Both speak fluent Cantonese. As set forth in more detail below, PUTATIVE OWNER #1 and PUTATIVE OWNER #2 posed on behalf of the FBI as owners of Quickly franchises.

21.    The FBI has not paid or compensated any witness for any information or service pertaining to this investigation.

### E. The San Francisco Planning Department

22. The San Francisco City Charter vests the Planning Commission with the authority to adopt and maintain a comprehensive, long-term general plan for the future improvement and development of San Francisco. The Planning Commission consists of seven citizen members: four appointed by the Mayor, and three appointed by the President of the Board of Supervisors.

23. The Planning Commission oversees the San Francisco Planning Department, which has day-to-day responsibility for administering the use of land in San Francisco through applying various policies, laws and regulations. Chief among these is the San Francisco Planning Code.

24. The Planning Department also reviews and acts upon applications for a large variety of city permits, to ensure compliance with code and other requirements.

25. PLANNING OFFICIAL #1 is a high-ranking administrator in the Planning Department.

26. PLANNING OFFICIAL #2 is a planner within the Planning Department who specialized in Planning Code enforcement matters.

### F. The San Francisco Formula Retail Ordinance

27. In or around November 2004, voters in San Francisco approved an ordinance (hereafter referred to as the "Formula Retail Ordinance") imposing restrictions on "formula businesses." Subsequently, in or around November 2006, San Francisco voters approved a ballot proposition to amend the Formula Retail Ordinance.

28. The Formula Retail Ordinance is codified in the San Francisco Planning Code, §§ 703.3 and 703.4.

29. Formula businesses are typically retail chain businesses that, by their nature, are required to adopt standardized services, methods of operation, decor, uniforms, trademarks and service marks, architecture or other features that are virtually identical from one store to the next. The purpose of the ordinance is to limit or discourage the establishment of multiple chain retail stores that might alter the distinct character of a city neighborhood.

30.     When a formula retail business wishes to open a store in San Francisco, the Formula Retail Ordinance requires notification of residents in the surrounding neighborhood. The Ordinance provides that neighbors may request a public hearing, subjecting the store to additional scrutiny. The Ordinance further makes a proposed store's application a conditional use, requiring review and approval by the San Francisco Planning Commission.

31.     If a business qualifies as a "formula retail" business and fails to apply for the appropriate authorization, the Planning Department can issue a Notice of Violation. It is the practice of the Planning Department to deliver these Notices through the United States mails. The issuance of a Notice triggers a formal process that could lead to severe penalties against the offending business.

### III. FACTS SUPPORTING PROBABLE CAUSE

### A.   Supervisor Jew meets with Planning Department officials

32.     The facts set forth in ¶¶ 33 through 74, below, are based on my (and other FBI agents') interviews with percipient witnesses, as well as my review of documents.

33.     On Wednesday, March 14, 2007, top officials at the Planning Department went to San Francisco City Hall to meet with JEW in his City Hall office suite.

34.     During this meeting, JEW brought up the topic of a lease dispute between the Irving Street Quickly Store and a rival business. JEW supplied details about the Irving Street Quickly Store, as well as the Quickly chain, to the Planning Department officials.

35.     PLANNING OFFICIAL #1, a high-ranking official in the Planning Department, had never heard of Quickly until JEW broached the topic. PLANNING OFFICIAL #1 told JEW he would look into the Irving Street Quickly Store.

36.     Upon his return to the Planning Department office, PLANNING OFFICIAL #1 looked at the department's internal records concerning the Irving Street Quickly Store. On March 14, 2007, at 5:38 pm, PLANNING OFFICIAL #1 sent JEW an email that read as follows:

Supervisor

In July 2006, [the Irving Street Quickly Store] applied for
a permit for "CHANGE TILE, AND PATCH DRY
WALL, FIX CABINET". This permit expired on January
9, 2007. There's no Formula Retail permit at all for this.

It also looks like there are about 13 Quickly's in SF.
This does seem to be a broad violation of the ordinance,
unless they predate the Formula Retail ordinance, which
became effective in early 2005.

I'll wait to hear from you before taking any action.

## B.  Volunteer #1 demands that Quickly store owners call him

37.    On Thursday, March 15, 2007, JEW asked VOLUNTEER #1, who
serves as a "community liaison" to JEW, to visit the Irving Street Quickly Store.

38.    Later the same day, VOLUNTEER #1 went to the Irving Street
Quickly Store, as requested. VOLUNTEER #1 told the attendant that he wanted to
speak with the owners. ASSOCIATE #1 and OWNER #1 were not present in the
store at the time. VOLUNTEER #1 hand-wrote on a piece of paper his first name
and a telephone number at which the store owners were to call him.

39.    When ASSOCIATE #1 received the information about VOLUNTEER
#1's visit, she contacted DISTRIBUTOR #1. DISTRIBUTOR #1 and ASSOCIATE
#1 then called VOLUNTEER #1.

40.    On the telephone, VOLUNTEER #1 told DISTRIBUTOR #1 and/or
ASSOCIATE #1 that he was someone who had "friends in City Hall."
VOLUNTEER #1 further said that the Irving Street Quickly Store was operating
illegally and would be shut down if it was not brought into compliance with city law.

41.    That evening, VOLUNTEER #1 reported to JEW what had occurred in
VOLUNTEER #1's various conversations with Quickly representatives.

## C.  Jew personally visits Irving Street Quickly Store twice

42.    On Friday, March 16, 2007, JEW personally visited the Irving Street
Quickly Store. ASSOCIATE #1 and OWNER #1 were not present. JEW left his
official City Hall business card and directed that the store owner contact him.

43.    During the weekend of March 17–18, 2007, JEW again personally dropped by the Irving Street Quickly Store looking for the owner. ASSOCIATE #1 and OWNER #1 were not present. JEW left a handwritten note with his name (written in Chinese) and telephone numbers.

44.    Pursuant to JEW's instructions, ASSOCIATE #1 called JEW at one of the telephone numbers he had left at her store. JEW asked the Irving Street Quickly Store owners to meet him in his City Hall office.

## D.    First meeting at City Hall

45.    On Monday, March 19, 2007, ASSOCIATE #1 and OWNER #1 met with JEW in his City Hall offices.

46.    At this meeting, JEW told ASSOCIATE #1 and OWNER #1 that he had been looking for them for a long time. JEW told ASSOCIATE #1 and OWNER #1 that the Irving Street Quickly Store was operating illegally in San Francisco.

47.    In support of his assertion, JEW gave OWNER #1 and ASSOCIATE #1 a printout of the email of March 14, 2007, to JEW from PLANNING OFFICIAL #1. JEW then told OWNER #1 and ASSOCIATE #1 that the e-mail indicated that the shop was in trouble, and that the other San Francisco Quickly shop owners could expect to receive Notices of Violation soon.

48.    ASSOCIATE #1 asked JEW what OWNER #1 and ASSOCIATE #1 could do to fix the problem. JEW told ASSOCIATE #1 that they needed to pay $10,000 to City officials so that they would speak favorably on the store's behalf. ASSOCIATE #1 asked JEW if they were to pay $10,000, would their shop be clear of any trouble from the City. JEW told her, "No."

49.    JEW then telephoned someone and spoke in English. When he hung up the telephone, JEW told ASSOCIATE #1 that the "department" also wanted $10,000, so the total was to be $20,000.

50.    OWNER #1 and ASSOCIATE #1 discussed the proposition between themselves, then told JEW that they were two people running a small business. They then asked if JEW could help them.

51.    JEW told them that he was already helping them, and that if they delayed any longer, the price would increase to $50,000. OWNER #1 and ASSOCIATE #1 then agreed to pay JEW the $20,000, as requested. JEW asked

them to come to his flower shop in Chinatown by 9 am the following day (Tuesday, March 20, 2007), to deliver the payment personally.

52. OWNER #1 and ASSOCIATE #1 asked if JEW would accept a check. JEW said he would only accept cash and would not accept a check. OWNER #1 and ASSOCIATE #1 said it would be difficult for them to round up $20,000 in cash in such a short time.

53. JEW then said he would give them until Wednesday, March 21, to come up with the cash. JEW instructed them to come to his flower shop on the morning of March 21. He wrote the address of the Canton Flower Shop on a piece of paper and handed it to them.

## E. Subsequent telephone calls

54. ASSOCIATE #1 and OWNER #1 called DISTRIBUTOR #1 about the demands made by JEW. DISTRIBUTOR #1 told them that it sounded illegal.

55. ASSOCIATE #1 and OWNER #1 asked LANDLORD #1 to help them come up with the cash for the payment.

56. LANDLORD #1 called JEW and asked why the payment had to be in cash. JEW responded that if the Irving Street Quickly Store wished to pay by check, it would have to pay a larger amount in order to "offset taxes." LANDLORD #1 told JEW he would not be able to pay by the Wednesday deadline that JEW had earlier set.

## F. First meeting at Canton Flower Shop

57. On Wednesday, March 21, 2007, ASSOCIATE #1 went to the Canton Flower Shop, as JEW had requested. ASSOCIATE #1 did not have money with her.

58. When ASSOCIATE #1 arrived in the flower shop, both JEW and his wife, LORENE CHAN, were working in the shop. LORENE CHAN admonished ASSOCIATE #1 that ASSOCIATE #1 should not be talking to LANDLORD #1 about ASSOCIATE #1's business with JEW.

59. Approximately fifteen minutes later, CO-CONSPIRATOR #1 arrived at the flower shop, This was the first time that any Quickly representative had met CO-CONSPIRATOR #1. JEW claimed that the $20,000 payment was for CO-CONSPIRATOR #1, and if there were questions why the payments had to be in the form of cash, those questions should be addressed to CO-CONSPIRATOR #1.

AFFIDAVIT OF J. CHRISTOPHER McDONOUGH
IN SUPPORT OF COMPLAINT                8

60.     JEW said that ASSOCIATE #1 and OWNER #1 should pay the money
as requested, "then we talk." JEW asked ASSOCIATE #1 and OWNER #1 to meet
with him to deliver the cash.

## G.    Another meeting at City Hall

61.     On a subsequent date, believed to be on or about Monday, March 26,
2007, ASSOCIATE #1 and LANDLORD #1 met JEW again at his City Hall office.
CO-CONSPIRATOR #1 was present during this meeting.

62.     In that meeting, LANDLORD #1 told JEW he would only pay by check
and would not pay cash. LANDLORD #1 further stated that someone at the
Planning Department had given assurances to Quickly that the San Francisco
stores were, in fact, in compliance with city law.

63.     In response, JEW gave LANDLORD #1 and ASSOCIATE #1 a printout
of an email to JEW from the Planning Department. In this email, which was sent
on March 22, 2007, at 8:49 am, PLANNING OFFICIAL #1 reported to JEW that
Planning Department employees had checked on twelve Quickly locations in San
Francisco—including the Irving Street Quickly Store—and that all were in violation
of the Planning Code.

64.     JEW told LANDLORD #1 and ASSOCIATE #1 that this email
confirmed that all the Quickly stores in San Francisco were in trouble.
ASSOCIATE #1 asked if the $20,000 payment would cover the compliance issues for
all the Quickly stores. JEW responded that the $20,000 payment would only cover
the Irving Street Quickly Store.

65.     JEW then became angry and told ASSOCIATE #1 that she could end
up having to pay $50,000 if she continued to delay.

66.     JEW instructed ASSOCIATE #1 to arrange for all the San Francisco
Quickly store owners to come to his office to discuss the price for helping with their
impending violations of the Planning Code. JEW said it would be cheaper for the
store owners to negotiate a price together. JEW told ASSOCIATE #1 that all the
Quickly stores could now expect to receive Notices of Violation from the Planning
Department.

67.     Thereafter, CO-CONSPIRATOR #1 telephoned ASSOCIATE #1 several
times and exhorted ASSOCIATE #1 to bring all the Quickly shop owners together to
negotiate a price to pay JEW.

## H.    Planning Department mails out Notice of Violation

68.    PLANNING OFFICIAL #1 observed a general practice of going out of his way to show responsiveness and courtesy to members of the Board of Supervisors, to whom Planning Department employees ultimately report.

69.    To this end, PLANNING OFFICIAL #1 had verbally assured JEW that planning officials would keep JEW apprised of their efforts to check the legal status of the Quickly stores. As set forth in ¶36, above, in his email of March 14, 2007, PLANNING OFFICIAL #1 had also promised JEW: "I'll wait to hear from you before taking any action."

70.    At some point, JEW communicated to PLANNING OFFICIAL #1 that JEW approved of the Planning Department moving forward with issuing Notices of Violation to the Quickly stores for alleged violations of the Formula Retail Ordinance. PLANNING OFFICIAL #1 instructed department employees to proceed against the Irving Street Quickly Store first, before taking action against any other Quickly franchise, in light of the interest that JEW had shown in the Irving Street Quickly Store.

71.    On April 23, 2007, the Planning Department prepared a Notice of Violation to the Irving Street Quickly Store. The Notice cited the Irving Street Quickly Store for violating San Francisco Planning Code §§ 703.3 and 703.4, Operation of a Formula Retail Use. The Notice required that within fifteen days of the Notice date, the Irving Street Quickly Store seek a "conditional use authorization," or file an appeal. Accordingly, the deadline for action was May 8, 2007.

72.    Pursuant to its ordinary course of business, the San Francisco Planning Department used the United States mails to transmit copies of a Notice of Violation to LANDLORD #1 and ASSOCIATE #1. These mailings were postmarked on April 25, 2007.

73.    The Notice identified PLANNING OFFICIAL #2 as the Planning Department official who was handling the case.

## I.    FBI is informed of scheme

74.    On May 2, 2007, someone notified the FBI of the foregoing activity. FBI agents contacted ASSOCIATE #1 and OWNER #1 and received their permission to conduct consensually-monitored conversations with JEW and CO-CONSPIRATOR #1. As the investigation developed, DISTRIBUTOR #1,

AFFIDAVIT OF J. CHRISTOPHER McDONOUGH
IN SUPPORT OF COMPLAINT                  10

PUTATIVE OWNER #1 and PUTATIVE OWNER #2 also gave permission to conduct consensually-monitored conversations.

75.   The facts set forth in ¶¶ 76 through 109, below, are based on my review of transcripts of the consensually-monitored conversations (translated into English from Cantonese), in addition to FBI interviews with percipient witnesses and my review of documents.

## J.   Meeting at Sweetheart Café in Chinatown

76.   On May 3, 2007, at approximately 9:30 pm, ASSOCIATE #1, OWNER #1 and DISTRIBUTOR #1 met JEW and CO-CONSPIRATOR #1 at the Sweetheart Café in Chinatown, approximately half a block from JEW's flower shop. The meeting was monitored and recorded by the FBI.

77.   I have reviewed the transcript of the meeting, which reflects the following details: JEW wanted to know how many Quickly store owners ASSOCIATE #1 was able to recruit to pay. Further, he wanted ASSOCIATE #1 to prepare a list of the store owners that would be participating in the payment. JEW said that it would be $10,000 per shop if ASSOCIATE #1 could get seven or eight shop owners to pay. JEW said not to pay him now, but rather to wait until they could determine how many other store owners would participate in paying. JEW said that the store owners needed to sign papers for a conditional-use permit.

78.   In the following passage from the transcript, JEW touts his own influence in his official capacity:

>  ASSOCIATE #1: Uh, Supervisor Jew, if we paid the money, and when the time comes you guys couldn't make it work . . .
>
>  OWNER #1: The public hearing is coming out
>
>  ASSOCIATE #1: And the hearing is coming out, it's not being passed, then isn't it a waste of time?
>
>  JEW: But in my . . . my district the chance is very high that . . .
>
>  ASSOCIATE #1: Isn't it? It becomes a waste of time. A public hearing is taking place, some people are

opposing to it, and the [shop] ends up not being able to open . . . that's dreadful! And we already paid you for it!

JEW: But I . . . I . . . I will talk to them. I will write a letter, and I will issue a notice . . .

ASSOCIATE #1: Do you understand?

JEW: They will listen to the city supervisor in that district. That's how it usually works.

ASSOCIATE #1: So we're hoping that you'll be able to help us.

JEW: But what I'm saying is, I told you to do it earlier, but you didn't do it, so now the [situation] escalates to this point.

79.   At one point in the conversation, ASSOCIATE #1 states a desire to avoid a public hearing.   ASSOCIATE #1 asks JEW whether paying an extra $2,000—*i.e.,* $12,000 instead of $10,000—could accomplish that:

ASSOCIATE #1: Then . . . then . . . I want to ask . . . . why don't we pay out another two thousand dollars, then we . . .

CO-CONSPIRATOR #1: Two thousand dollars for what?

ASSOCIATE #1: No, no, let's say if I pay twelve thousand dollars, could there not be a public hearing then?

CO-CONSPIRATOR #1: No, no.

JEW:  If you pay, *if you pay at that time, there might be a chance.*

ASSOCIATE #1: Uh, meaning it doesn't work with the situation we're in

JEW:  That's right, that's why I . . .

AFFIDAVIT OF J. CHRISTOPHER McDONOUGH
IN SUPPORT OF COMPLAINT                    12

DISTRIBUTOR #1: Even an appeal doesn't work?

CO-CONSPIRATOR #1: No.

ASSOCIATE #1: Because I feel I have no security

OWNER #1: No, the amount of the money is, Representative Jew . . . (U/I) . . . I'd rather spend more money than have a public hearing . . .

80. During the conversation, ASSOCIATE #1 and OWNER #1 lament that they do not speak English and desperately want to avoid a public hearing. JEW then assures them that following a public hearing, the Planning Commission permitted the owner of an unnamed store ("OWNER #2") to keep his business open—despite opposition from several members of the community—due to JEW's support, in his official capacity, for the "necessity" of the business:

ASSOCIATE #1: We were hoping to pay the money and take care of the matter, that's the best thing. The worst is to have to take care of the leftovers at the end, when it comes back to say its not working. We don't have that kind of energy.

OWNER #1: We worry we don't have the energy when time comes for the public hearing . . . What I'm saying is can there not be a public hearing?

JEW: Do you know, do you know how many people are opposed to [OWNER #2]? There's four to five people who opposes him.

ASSOCIATE #1: Uh

JEW: Not allowing him to open/operate

ASSOCIATE #1: Uh, then why is it he can operate now?

JEW: Oh, [because] the city supervisor says he's supporting the necessity of the operation.

ASSOCIATE #1: Uh.

JEW: So he's allowed to open.

81. JEW repeatedly chastises ASSOCIATE #1 and OWNER #1 for not agreeing to pay sooner, and suggests that if they had done so, they could have avoided the necessity of a public hearing:

> ASSOCIATE #1: Right now they have all agreed to go for it. But a question remains with the issue is that if it's a go, can a public hearing be avoided in the process . . . ?

> JEW: No, it's too late, too late. I already told you.

> ASSOCIATE #1: Too late . . . but to pay out more money, is that going to work?

> JEW: *When it costs more money, I'd let you know. I told you before, and you guys didn't believe me.*

> ASSOCIATE #1: We didn't know then, you'd have to sympathize with us.

> JEW: (sigh) I told you at that time already.

> ASSOCIATE #1: . . . If I had known the consequence, I would have done it already.

> JEW: Yeah, okay.

82. During the meeting, JEW is offered cash but declines to accept it just yet, instructing DISTRIBUTOR #1, OWNER #1 and ASSOCIATE #1 first to line up other Quickly store owners before he accepts any money:

> DISTRIBUTOR #1: We got five thousand dollars out today, then . . .

> JEW: No! Don't give it to me yet, just wait.

> DISTRIBUTOR #1: Uh huh, just wait for the rest?

> JEW: Yes, just wait. I'll let you know tomorrow.

AFFIDAVIT OF J. CHRISTOPHER McDONOUGH
IN SUPPORT OF COMPLAINT                14

CO-CONSPIRATOR #1: Is this set for me? These letters here?

DISTRIBUTOR #1: There one . . . this one is a duplicate . . . it's a quote . . . quote

OWNER #1: You'd need to make a call and take care of my stuff first, otherwise if something happens . . .

JEW: I told you, I told you earlier and you didn't believe me. That's why I feel . . .

OWNER #1: So you're saying for one night I . . .

JEW: No! Because . . . that's why I'd need to know how many . . .

OWNER #1: Oh, how many are paying.

JEW: If not, then the ten thousand dollars is not going to work.

OWNER #1: So you need to know how many are getting it done and paying. If only it's me who's going ahead, then ten thousand dollars will not be sufficient.

ASSOCIATE #1: Meaning if I'm the only one who's doing it, then ten thousand dollars is not going to work.

OWNER #1: So (we) need to talk to them.

JEW: Yeah.

OWNER #1: That's why he's not accepting my money for now.

JEW: That's why . . . that's why I'm not accepting your money for now. Because I need to know how many people . . .

OWNER #1: Oh, okay.

JEW: Do you understand?

OWNER #1: Uh huh.

DISTRIBUTOR #1: Okay.

JEW: Okay?

OWNER #1: Uh huh, I understand.

JEW: So the best thing is that you . . . tomorrow you . . . uh . . .

ASSOCIATE #1: So don't say that you're not going to help me because I haven't paid now, it has nothing to do with me.

83. JEW repeatedly talks throughout the conversation about official acts he will take on behalf of DISTRIBUTOR #1, OWNER #1 and ASSOCIATE #1, including helping them stall out the process, and making telephone calls to Planning Department officials on their behalf.

## K. New Quickly "owners" enter the picture

84. On May 4, 2007, DISTRIBUTOR #1 spoke to JEW on the telephone. In this conversation, which was tape-recorded, JEW directed DISTRIBUTOR #1 to bring Quickly store owners to meet him that evening at his flower shop to discuss the amount of money to be paid.

85. The FBI arranged for PUTATIVE OWNER #1 and PUTATIVE OWNER #2, also fluent Cantonese speakers, to accompany DISTRIBUTOR #1 to the meeting and to pose as San Francisco Quickly store owners in JEW's electoral district.

## L. Meeting at Canton Flower Shop

86. Later on May 4, 2007, at approximately 8:40 pm, when the flower shop had been closed to the public for the evening, DISTRIBUTOR #1, PUTATIVE OWNER #1 and PUTATIVE OWNER #2 met with JEW in his shop. (ASSOCIATE #1 and OWNER #1 did not attend this meeting.) This meeting was consensually monitored and recorded by the FBI.

87. DISTRIBUTOR #1 reported to JEW that eight Quickly stores had agreed to pay $10,000 per store, per JEW's demands, for a total payment of $80,000. DISTRIBUTOR #1 stated that the store owners were not able to pay the whole sum of $80,000 right away, but that they did have some money ready to be paid immediately. JEW again stated that he would not collect any money at the moment.

88. JEW told DISTRIBUTOR #1, PUTATIVE OWNER #1 and PUTATIVE OWNER #2 that CO-CONSPIRATOR #1 would assist them in completing the forms for acquiring a permit from the Planning Department, while JEW would help them from the "inside" by speaking to officials within the Planning Department. JEW further touted his status as the "boss" to Planning Department officials:

> JEW: He, he [CO-CONSPIRATOR #1] will help you fill out all the forms, then talk to that person, and I will be inside to help you . . ..

> PUTATIVE OWNER #2: So you, you know someone from the inside?

> JEW: [PLANNING OFFICIAL #2]

> PUTATIVE OWNER #2: [PLANNING OFFICIAL #2], you know [PLANNING OFFICIAL #2]?

> JEW: I have already talked to him.

---

> JEW: To represent these few stores, he [CO-CONSPIRATOR #1] will, uh, help you filled out all these forms, submit it to him, then I have already spoken to [PLANNING OFFICIAL #2].

> PUTATIVE OWNER #2: Uh.

> JEW: And also to [PLANNING OFFICIAL #1], the highest ranking. . .

> PUTATIVE OWNER #2: [PLANNING OFFICIAL #1].

JEW: [PLANNING OFFICIAL #1], you know him.

PUTATIVE OWNER #2: Uh. [laughing]

PUTATIVE OWNER #2: We know. You know [PLANNING OFFICIAL #1]?

JEW: Yes, he, he, *I am his boss.*

PUTATIVE OWNER #2: Oh.

JEW: Okay, I told him like this, they have filled out the forms, you go ahead and have them do it, according to the way it's done.

PUTATIVE OWNER #2: Uh, then there's no problem.

JEW: No.

PUTATIVE OWNER #2: Are you sure there won't be a problem.

JEW: You, you, listen to me, okay?

PUTATIVE OWNER #1: Don't be so impatient, he's trying to help you.

JEW: What I mean is right now I am helping you take care of this matter.

89.    JEW asserts that the money paid by the store owners would go to CO-CONSPIRATOR #1, not himself, and that CO-CONSPIRATOR #1 would assist the store owners with the paperwork, but JEW would be assisting "in the back." JEW further states that the relevant Planning Department officials are aware that CO-CONSPIRATOR #1 and JEW are together:

DISTRIBUTOR #1: What we're most afraid of, and I'm not saying, looking for an attorney. What I mean is that we thought by going to you Supervisor JEW, you with the city government, you would have the power

that they would listen to you. But if you just send [CO-CONSPIRATOR #1], they might not listen to him.

JEW: But I'm in the back.

DISTRIBUTOR #1: Oh.

JEW: Do you understand?

DISTRIBUTOR #1: I understand.

JEW: I'm in the back and I, I would say I strongly support [CO-CONSPIRATOR #1] in helping these small businesses, so he. . .

PUTATIVE OWNER #2: But the problem is does [PLANNING OFFICIAL #1] know that [CO-CONSPIRATOR #1] and you are together?

JEW: He does.

PUTATIVE OWNER #2: He does.

DISTRIBUTOR #1: Also knows [PLANNING OFFICIAL #1].

JEW: [PLANNING OFFICIAL #1] knows [PLANNING OFFICIAL #2].

_____

PUTATIVE OWNER #2: Oh.

JEW: So, I'm inside but I cannot collect the money, I don't collect the money. What I mean is that I introduce him, I understand, and he knows what to do. If you don't like it, find someone else, that's it.

90.     At one point during the meeting, JEW asserts that as a Supervisor, he sits atop the Planning Department in the city hierarchy, and their decisions must go through him. To illustrate his point, JEW makes a schematic drawing showing the

hierarchical relationship between the Office of Mayor, the Board of Supervisors, and the City department heads.

> JEW: What I mean, what I mean is that you find someone who would say they would definitely help you, but *what I'm saying is that right now I'm helping you from the inside.* For example once he reached a department, to my place and now he says they have filled out everything and then have me look over it, he will ask me.

> PUTATIVE OWNER #2: So Planning has to ask you?

> JEW: Yes.

> PUTATIVE OWNER #2: Oh.

> JEW: *They have to pass through me.  This is my district.*

> DISTRIBUTOR #1:  A Supervisor is higher than Planning.

> JEW: Let me tell you, the Mayor is here [drawing diagram and pointing].

> PUTATIVE OWNER #2: Mayor.

> JEW: The Mayor is here, the City Supervisor is here, okay, there are eleven, one, two, three, four, five, six, seven, eight, nine, ten, and eleven.  These are on the bottom, Planning.  *They must come to us first.*

> PUTATIVE OWNER #2: Oh, so Planning has to ask you first?

> JEW: They have to ask me first.

> PUTATIVE OWNER #2: . . . so the Planning has to check the advice from the Supervisor?

JEW: Yes.

91.     The meeting concluded at approximately 9:20 pm, and the putative owners left the flower shop with JEW. The parties separated, and the FBI observed JEW walk to his car, in which a female was waiting.

## M.     Telephone call with Co-Conspirator #1

92.     At approximately 9:40 pm the same evening, CO-CONSPIRATOR #1 telephoned DISTRIBUTOR #1. The FBI consensually recorded the telephone call. CO-CONSPIRATOR #1 and DISTRIBUTOR #1 spoke in English.

93.     CO-CONSPIRATOR #1 told DISTRIBUTOR #1 to give him the names of the Quickly store owners who would be paying JEW.

94.     During the conversation, CO-CONSPIRATOR #1 said that if the Quickly owners did not hire him, it would be difficult for them to gain access to someone at the Board of Supervisors level: "You guys could do it yourself and try, but how hard is it gonna be for you to call another supervisor, [UI] spend the time to talk to them."

95.     CO-CONSPIRATOR #1 then said that if the owners did not hire CO-CONSPIRATOR #1, then JEW would not have a "vested interest" in assisting the Quickly owners with their city problems: "It's not that [Jew] won't help you, it's just that, you know, *he won't have the vested interest.*"

96.     CO-CONSPIRATOR #1 further told DISTRIBUTOR #1 that if the Quickly owners do not hire CO-CONSPIRATOR #1, then JEW "is not gonna allocate a lot of his resource and a lot of his time toward this issue."

## N.     Meeting at Canton Flower Shop; Jew accepts $40,000 in cash

97.     On May 7, 2007, JEW and ASSOCIATE #1 spoke on the telephone. In that conversation, JEW told ASSOCIATE #1 to bring Quickly store owners to meet him that evening at his flower shop to discuss the amount of money to be paid.

98.     At approximately 7:30 pm the same evening, ASSOCIATE #1, OWNER #1, PUTATIVE OWNER #1 and PUTATIVE OWNER #2 met JEW at his flower shop, when it had closed for the evening. CO-CONSPIRATOR #1 was not present.

99.    ASSOCIATE #1 told JEW that the situation with her store was urgent. ASSOCIATE #1 asked JEW whether everything would have been okay had she paid him $20,000 last month. JEW said everything would have been fine.

100.    ASSOCIATE #1 expressed concern said that the Planning Department would begin imposing monetary penalties on her Quickly store beginning the following day, inasmuch as the Notice of Violation set a deadline of May 8, 2007. JEW responded that he would make a telephone call to PLANNING OFFICIAL #2 so that the Quickly store could continue to operate.

101.    As noted in ¶87, the parties had agreed that eight Quickly stores would each pay $10,000, for a total payment of $80,000. PUTATIVE OWNER #1 and PUTATIVE OWNER #2 offered, on behalf of the Quickly store owners, to make an immediate payment of $40,000 to JEW, with a balance of $40,000 to be paid later. JEW did a calculation and said that fines would have totaled $15,000 per store per month.

102.    JEW then told them he had to check with CO-CONSPIRATOR #1. JEW made a telephone call, told CO-CONSPIRATOR #1 to go to a place that was quiet, and then to call him back at his shop telephone number. A few minutes later, CO-CONSPIRATOR #1 called back. JEW put the call on loudspeaker. JEW told CO-CONSPIRATOR #1 that the store owners were ready to make a partial payment at that moment. JEW instructed CO-CONSPIRATOR #1 to come to the flower shop the next morning at 7:45 a.m. JEW told CO-CONSPIRATOR #1 that he "...need[s] [PLANNING OFFICIAL #2] to stall so that the store owners will have time to fill out all the papers. You understand?" CO-CONSPIRATOR #1 replied, "Understand."

103.    ASSOCIATE #1, OWNER #1, PUTATIVE OWNER #1 AND PUTATIVE OWNER #2 then put $40,000 in cash on JEW's desk. The cash consisted of $100 bills, whose serial numbers had been recorded by the FBI.

104.    JEW counted the money, bill by bill. When he finished counting, JEW set the stacks of money behind his computer, and showed ASSOCIATE #1, OWNER #1, PUTATIVE OWNER #1 and PUTATIVE OWNER #2 out of his flower shop.

### O.    JEW meets with CO-CONSPIRATOR #1

105.    The next morning, on May 8, 2007, the FBI observed CO-CONSPIRATOR #1 meet JEW on the sidewalk outside the flower shop, then enter the flower shop together. Approximately ten minutes later, the FBI observed CO-CONSPIRATOR #1 leaving the flower shop.

### P.    Co-Conspirator #1 supplies "invoice"

106.    On or about May 9, 2007, CO-CONSPIRATOR #1 delivered an "invoice" to PUTATIVE OWNER #1 , stating that the "balance due" was $5,000.

107.    On or about May 10, 2007, PUTATIVE OWNER #1 and CO-CONSPIRATOR #1 spoke on the telephone. The conversation was conducted in English and was consensually recorded.

108.    In the conversation, PUTATIVE OWNER #1 asked CO-CONSPIRATOR #1 why he had a balance due. CO-CONSPIRATOR #1 responded that he had been told by JEW that the fee per store was $15,000. CO-CONSPIRATOR #1 further said that JEW was the one who negotiated the rates, and JEW had told CO-CONSPIRATOR #1 what the price would be.

109.    CO-CONSPIRATOR #1 further reassured PUTATIVE OWNER #1 that he and/or JEW had secured PLANNING OFFICIAL #2's cooperation in waiving daily penalties. CO-CONSPIRATOR #1 then concluded by telling PUTATIVE OWNER #1, "I spoke to Supervisor JEW and we are in agreement that we're going to try to drag this process out as long as possible. Hopefully after the summer."

### Q.    FBI agents interview Jew

110.    On May 18, 2007, FBI agents went to the Canton Flower Shop and encountered JEW on a nearby street. JEW agreed to an interview and returned to the flower shop with agents.

111.    JEW told the FBI that the only time he had ever personally visited the Irving Street Quickly Store was to ask permission to put up a campaign poster during his 2006 campaign for the Board of Supervisors. He claimed he had never been there at any other time.

112.    JEW told the FBI that ASSOCIATE #1 and LANDLORD #1 first came to City Hall of their own volition. They asked for his help after receiving a Notice of Violation. JEW claimed he told them that he could not do anything for them, and instead referred them to CO-CONSPIRATOR #1.

113.    JEW told the FBI that on May 7, 2007, he ran into CO-CONSPIRATOR #1 by sheer coincidence somewhere in the Sunset District. JEW claimed that CO-CONSPIRATOR #1 told JEW that CO-CONSPIRATOR #1 could

not attend a meeting that evening with Quickly representatives. JEW further claimed that CO-CONSPIRATOR #1 asked JEW to collect CO-CONSPIRATOR #1's fee, and that CO-CONSPIRATOR #1 said he would pick it up the next day.

114.   JEW told the FBI that per CO-CONSPIRATOR #1's directive, JEW met with Quickly representatives and collected $40,000 in cash. JEW insisted that CO-CONSPIRATOR #1 was the one who wanted the payments in cash, and that JEW had no idea why CO-CONSPIRATOR #1 would only accept cash. JEW said he felt "uncomfortable" accepting the money on CO-CONSPIRATOR #1's behalf, and that JEW found the situation to be "awkward."

115.   JEW further told FBI agents that he gave the entire sum of $40,000 to CO-CONSPIRATOR #1 the day after receiving the cash. JEW claimed he did not keep any of the money.

116.   Midway through the interview, an FBI agent revealed to JEW that the FBI had recorded some of his conversations with Quickly representatives. The FBI agent also informed JEW that agents would be interviewing other witnesses in the matter.

117.   At this point, JEW changed his story and admitted that he kept $20,000 in cash and gave CO-CONSPIRATOR #1 only half of the money. JEW also admitted that it was he who had told Quickly representatives that they would receive a "discount" for paying in cash.

118.   JEW explained to the FBI that he was going to donate his $20,000 share of the Quickly cash to charity. He later changed his story, and said he was going to give a "big portion" to charity, and keep a smaller portion to hold in reserve to purchase hot dogs, hamburgers and drinks that community organizations might need for community events.

## R.   FBI finds cash at Jew's residence in Burlingame

119.   On May 18, 2007, FBI agents executed search warrants at a variety of locations. One of these locations was JEW's residence at 2116 Roosevelt Avenue in Burlingame, California.

120.   While searching JEW's Burlingame residence, agents found $10,000 in $100 bills that matched the serial numbers of the bills that FBI agents had previously recorded.

121. FBI agents did not find the other $10,000 in cash at any search-warrant location. These locations included JEW's City Hall office suite, the Canton Flower Shop, and his residence at 2450 28th Avenue in San Francisco.

## IV. PROBABLE CAUSE OF CRIMINAL VIOLATION

### A. Supervisor Jew's duty of honest services

122. As an elected member of the Board of Supervisors for the City and County of San Francisco, JEW owed a duty to provide honest services to the people of the Sunset District, the City and County of San Francisco, and the State of California.

123. Certain California criminal laws governed JEW's conduct as a member of the San Francisco Board of Supervisors, including, but not limited to, the following:

a. California criminal laws prohibited JEW from asking to receive, agreeing to receive, or receiving any bribe (as defined by California Penal Code § 7) upon any agreement or understanding that his action upon any matter in his official capacity would be influenced by such a bribe. *See* CALIFORNIA PENAL CODE § 68.

b. California criminal laws prohibited JEW from knowingly asking to receive, agreeing to receive, or receiving any unauthorized emolument, gratuity, or promise thereof for performing any official act. *See* CALIFORNIA PENAL CODE § 70.

### B. Scheme to defraud the public of its right to Jew's honest services

124. Based on the foregoing, there is probable cause to believe that JEW did knowingly and intentionally devise a material scheme and artifice to deprive the people of the Sunset District, the City and County of San Francisco, and the State of California of their intangible right to his honest services as a member of the Board of Supervisors for San Francisco.

125. As set forth in ¶ 72, above, the San Francisco Planning Department used the United States mails in the ordinary course of business to transmit copies of a Notice of Violation to LANDLORD #1 and ASSOCIATE #1.

126.    As set forth in ¶¶ 47 and 66, above, JEW had warned and threatened OWNER #1 and ASSOCIATE #1 that they and other Quickly store owners would receive Notices of Violation. Accordingly, there is probable cause to believe that JEW could reasonably foresee the use of the mails to convey the Notice of Violation. *See* 9TH CIR. CRIM. JURY INSTR. 8.102 (2003) ("A mailing is caused when one knows that the mails will be used in the ordinary course of business or when one can reasonably foresee such use.").

## V. CONCLUSION

127.    Based on the information contained in this affidavit, I believe there is probable cause to believe that defendant EDMUND JEW has used the mails in furtherance of a material scheme to deprive the people of the Sunset District, the City and County of San Francisco, and the State of California of their intangible right to his honest services as a member of the Board of Supervisors for San Francisco, in violation of 18 U.S.C. §§ 1341 and 1346.

I declare under the penalty of perjury that the forgoing is true and correct to the best of my knowledge and belief.

J. CHRISTOPHER McDONOUGH
Special Agent
Federal Bureau of Investigation

September 20, 2007
Date

Sworn to and subscribed before me on this __20th__ day of September, 2007.

HON. ELIZABETH D. LAPORTE
United States Magistrate Judge

AFFIDAVIT OF J. CHRISTOPHER McDONOUGH
IN SUPPORT OF COMPLAINT                26