## DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

BY: ☐ COMPLAINT   ☐ INFORMATION   ☒ INDICTMENT

☐ SUPERSEDING

**Name of District Court, and/or Judge/Magistrate Location**
NORTHERN DISTRICT OF CALIFORNIA

**FILED**

### OFFENSE CHARGED

Counts One and Two -- 18 U.S.C. sec. 1341 & 1346 (Mail Fraud: Deprivation of Honest Services); Counts Three and Four -- 18 U.S.C. sec. 666(a)(1)(B) (Bribery); Count Five -- 18 U.S.C. sec. 1951(a) (Extortion Under Color of Official Right)

☐ Petty
☐ Minor
☐ Misde-meanor
☒ Felony

**DEFENDANT - U.S.**

NOV - 6 2007

► EDMUND JEW

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

DISTRICT COURT NUMBER

## CR 07   0705

SI

### PENALTY:

Counts One, Two and Five: 20 years imprisonment; 3 years sup. rel.; $250,000 fine; $100 spec. assessment.
Counts Three and Four: 10 years imprisonment; 3 years sup. rel.; $250,000 fine; $100 spec. assessment.

E-filing

───── DEFENDANT ─────
**IS *NOT* IN CUSTODY**
Has not been arrested, pending outcome this proceeding.
1) ☐ If not detained give date any prior summons
was served on above charges ►

2) ☐ Is a Fugitive

3) ☐ Is on Bail or Release from (show District)

N.D. Cal.

**IS IN CUSTODY**
4) ☐ On this charge

5) ☐ On another conviction

6) ☐ Awaiting trial on other charges
☐ Fed'l   ☐ State

If answer to (6) is "Yes", show name of institution

### PROCEEDING

Name of Complaintant Agency, or Person (&Title, if any)

Federal Bureau of Investigation

☐ person is awaiting trial in another Federal or State Court, give name of court

☐ this person/proceeding is transferred from another district per (circle one) FRCrP 20, 21 or 40. Show District

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:
☐ U.S. Att'y   ☐ Defense

☐ this prosecution relates to a pending case involving this same defendant

☒ prior proceedings or appearance(s) before U.S. Magistrate regarding this defendant were recorded under ►

SHOW DOCKET NO.

MAGISTRATE CASE NO.
3-07-70559 EDL

Has detainer been filed?   ☐ Yes   ☐ No
If "Yes" give date filed

Month/Day/Year

**DATE OF ARREST**

Or... if Arresting Agency & Warrant were not

Month/Day/Year

**DATE TRANSFERRED TO U.S. CUSTODY**

Name and Office of Person Furnishing Information on THIS FORM

SCOTT N. SCHOOLS

☒ U.S. Att'y   ☐ Other U.S. Agency

Name of Asst. U.S. Att'y (if assigned)   Michael Li-Ming Wang

☐ This report amends AO 257 previously submitted

### ADDITIONAL INFORMATION OR COMMENTS

PROCESS:

☐ SUMMONS   ☒ NO PROCESS*   ☐ WARRANT   Bail Amount:

If Summons, complete following:
☐ Arraignment   ☐ Initial Appearance
Defendant Address:

*Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment

Date/Time:

Before Judge:

Comments:

# United States District Court

FOR THE
## NORTHERN DISTRICT OF CALIFORNIA
## CRIMINAL DIVISION

VENUE: **SAN FRANCISCO**

---

UNITED STATES OF AMERICA,

**V.**

EDMUND JEW,

FILED

NOV - 6 2007

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

E-filing

# CR 07    0705

# SI

DEFENDANT.

---

# INDICTMENT

Title 18 U.S.C. §§ 1341 & 1346 — Mail Fraud:
Deprivation of Honest Services (Two Counts); 18
U.S.C. § 666(a)(1)(B) — Bribery (Two Counts); 18
U.S.C. § 1951(a) — Extortion Under Color of Official
Right (One Count)

A true bill

_____
Foreman

Filed in open court this _____ day of
11/6/2007

_____
Clerk

Bail $ No process

SCOTT N. SCHOOLS (SCBN 9990)
United States Attorney

*FILED*

*NOV - 6 2007*

*RICHARD W. WIEKING*
*CLERK, U.S. DISTRICT COURT*
*NORTHERN DISTRICT OF CALIFORNIA*

E-filing

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

*SI*

# CR 07      0705

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) No.: |
| Plaintiff, | ) |
| | ) VIOLATIONS: 18 U.S.C. §§ 1341 & 1346 — |
| v. | ) Mail Fraud: Deprivation of Honest |
| | ) Services (Two Counts); 18 U.S.C. |
| | ) § 666(a)(1)(B) — Bribery (Two Counts); |
| EDMUND JEW, | ) 18 U.S.C. § 1951(a) — Extortion Under |
| | ) Color of Official Right (One Count) |
| Defendant. | ) |
| | ) SAN FRANCISCO VENUE |

I N D I C T M E N T

The Grand Jury charges:

COUNTS ONE & TWO:  18 U.S.C. §§ 1341 & 1346 (Mail Fraud)

At all times relevant to this Indictment:

INDIVIDUALS AND ENTITIES INVOLVED

A.     **San Francisco Board of Supervisors**

1.     The City and County of San Francisco was a consolidated city-county whose governance structure was codified in a Charter that San Francisco voters had ratified and, from time to time, amended.

INDICTMENT

2.      The Charter vested the legislative authority for the City and County of San Francisco in the San Francisco Board of Supervisors. The Board of Supervisors comprised eleven elected Supervisors, each of whom represented an electoral district whose geographic boundaries were delineated in the Charter. Voters residing in each district elected the Supervisor representing that district to staggered four-year terms.

3.      District Four, commonly known as the Sunset District, encompassed the western portion of San Francisco extending from 19th Avenue out to the shoreline of the Pacific Ocean, and from Lincoln Avenue at Golden Gate Park south to Sloat Avenue.

4.      During Fiscal Year 2006, the City and County of San Francisco received approximately $354 million in federal funds.

5.      The City and County of San Francisco was a political subdivision within the State of California. As such, San Francisco was a "local government," within the meaning of 18 U.S.C. § 666(d)(3).

**B.      Supervisor Edmund Jew**

6.      Defendant EDMUND JEW was a member of the San Francisco Board of Supervisors, representing the Sunset District.

7.      In addition to serving as an elected representative, JEW owned the Canton Flower Shop, located at 118 Waverly Place in San Francisco's Chinatown neighborhood. JEW had office space at the Canton Flower Shop. JEW spoke fluent Cantonese, in addition to English.

8.      On or about November 7, 2006, residents of the Sunset District elected JEW as their representative to the Board of Supervisors. On or about December 5, 2006, the Mayor of San Francisco appointed JEW to complete his predecessor's unexpired term representing the Sunset District on the Board of Supervisors. On or about January 8, 2007, JEW began serving the four-year term to which Sunset District voters had elected him in November 2006.

9.      As an elected member of the Board of Supervisors for the City and County of San Francisco, JEW was authorized to act on behalf of the San Francisco city

INDICTMENT                                    2

1  government, and was a representative to that government.  As such, JEW was an "agent"

2  of the City and County of San Francisco, within the meaning of 18 U.S.C. § 666(d)(1).

3      10.     Prior to taking office, JEW took an oath to support and defend the

4  Constitution of the United States and the Constitution of the State of California, and to

5  well and faithfully discharge the duties of his office.

6      11.     Certain California criminal laws governed JEW's conduct as a member of

7  the San Francisco Board of Supervisors, including, but not limited to, the following:

8          (a)     JEW was prohibited from asking to receive, agreeing to receive, or

9      receiving any bribe (as defined by California Penal Code § 7) upon any agreement

10     or understanding that his action upon any matter in his official capacity would be

11     influenced by such a bribe.  *See* CALIF. PENAL CODE § 68.

12         (b)     JEW was prohibited from knowingly asking to receive, agreeing to

13     receive, or receiving any unauthorized emolument, gratuity, or promise thereof for

14     performing any official act.  *See* CALIF. PENAL CODE § 70.

15     12.     California's Political Reform Act further governed JEW's conduct as a

16 member of the San Francisco Board of Supervisors, including, but not limited to, the

17 following:

18         (a)     JEW was prohibited from using his official position to influence a

19     governmental decision in which he knew, or had reason to know, he had a

20     financial interest.  *See* CALIF. GOVT. CODE § 87100.

21         (b)     JEW was prohibited from accepting gifts from any single source in

22     any calendar year with a total value of more than $250.  *See* CALIF. GOVT. CODE

23     § 89503.

24     13.     The official handbook issued to members of the San Francisco Board of

25 Supervisors placed JEW on notice that he was subject to the prohibitions of California's

26 Political Reform Act.

27     14.     The Charter for the City and County of San Francisco specified that JEW,

28 as an officer and employee of San Francisco, was subject to conflict-of-interest

INDICTMENT                                      3

1  restrictions: "Public office is a public trust and all officers and employees of the City and

2  County shall exercise their public duties in a manner consistent with this trust." SAN

3  FRANCISCO CHARTER § 15.103 (2007).

4  15.  The Charter prohibited JEW, as a member of the Board of Supervisors,

5  from interfering with city business outside the chain of command prescribed by law:

6  Neither the Board of Supervisors, its committees, nor any of
its members, shall have any power or authority, *nor shall they*
7  *dictate, suggest or interfere* with respect to any appointment,
promotion, compensation, disciplinary action, contract or
8  requisition for purchase or other *administrative actions or*
*recommendations* of the City Administrator or of department
9  heads under the City Administrator or under the respective
boards and commissions. The Board of Supervisors shall deal
10  with administrative matters *only* in the manner provided by
this Charter, and any dictation, suggestion or interference
11  herein prohibited on the part of any Supervisor shall
constitute official misconduct.

12  SAN FRANCISCO CHARTER § 2.114 (2007) (emphases added).

13  16.  The Charter further set forth a standard for "official misconduct" that

14  applied to JEW in his capacity as a Supervisor:

15  Official misconduct means any wrongful behavior by a public
16  officer in relation to the duties of his or her office, willful in
its character, including any failure, refusal or neglect of an
17  officer to perform any duty enjoined on him or her by law, or
conduct that falls below the standard of decency, good faith
18  and right action impliedly required of all public officers and
including any violation of a specific conflict of interest or
19  governmental ethics law.

20  SAN FRANCISCO CHARTER § 15.105(e) (2007).

21  17.  Consistent with state and local regulations, laws and prohibitions, as well as

22  his oath of office, JEW owed a duty to provide honest services to the people of the Sunset

23  District and the City and County of San Francisco, and to the Board of Supervisors for the

24  City and County of San Francisco.

25  **C.  Quickly Stores**

26  18.  Quickly was a worldwide chain of stores that sold tapioca and milk tea

27  beverages, as well as assorted food items. The worldwide parent company was Kuai Ke

28  Li Enterprise Co. Ltd., headquartered in Taiwan. Quickly maintained a corporate

INDICTMENT                    4

1   presence in the United States, which was known as "Quickly USA" and headquartered in
2   Hayward, California.

3       19.   Quickly operated approximately twelve franchises in San Francisco. These
4   stores were typically small carry-out operations, with limited seating in some locations.

5       20.   The QUICKLY OWNERS were Cantonese-speaking immigrants who spoke no
6   English. Together, they owned and operated a Quickly franchise at 2116 Irving Street
7   ("the Irving Street Quickly Store"), which was located in JEW's legislative district. The
8   QUICKLY OWNERS leased the space at 2116 Irving Street from LANDLORD #1.

9       **D.   Wonderful Foods/Wonderful Desserts & Café**

10      21.   From in or around 1993 until 2007, WONDERFUL OWNER #1 operated
11  Wonderful Foods at 2110 Irving Street in San Francisco, located in JEW's legislative
12  district. WONDERFUL OWNER #1 also leased the space at 2110 Irving Street from
13  LANDLORD #1.

14      22.   On or about April 5, 2007, WONDERFUL OWNER #1 opened Wonderful
15  Desserts & Café at 2035 Irving Street, also located in JEW's legislative district.

16      **E.   The San Francisco Planning Department**

17      23.   The San Francisco Charter vested the Planning Commission with the
18  authority to adopt and maintain a comprehensive, long-term general plan for the future
19  improvement and development of San Francisco. The Planning Commission comprised
20  seven citizen members: four appointed by the Mayor, and three appointed by the
21  President of the Board of Supervisors.

22      24.   The Planning Commission oversaw the San Francisco Planning
23  Department, which had day-to-day responsibility for administering the use of land in San
24  Francisco through applying various policies, laws and regulations, including the San
25  Francisco Planning Code. The Planning Department also reviewed and acted upon
26  applications for a large variety of city permits, to ensure compliance with Planning Code
27  and other requirements.

28  //

INDICTMENT                                    5

1    25.    PLANNING OFFICIAL #1 was a top administrator in the Planning Department.

2    26.    Pursuant to San Francisco Planning Code § 308.1, decisions of the Planning

3  Commission were subject to appeal to the Board of Supervisors, which had the power to

4  overrule Commission decisions on appeal.

5    **F.    Formula Retail Ordinance**

6    27.    On or about November 2, 2004, voters in San Francisco approved an

7  ordinance (hereafter referred to as the "Formula Retail Ordinance") imposing restrictions

8  on "formula businesses." On or about November 7, 2006, San Francisco voters amended

9  the Formula Retail Ordinance by way of ballot proposition. The Ordinance was codified

10  at San Francisco Planning Code §§ 703.3 and 703.4.

11    28.    Formula businesses were typically retail chain businesses, such as Starbucks

12  or McDonald's, characterized by certain features that were virtually identical from one

13  store to the next. The Formula Retail Ordinance prescribed an approval process for any

14  formula business wishing to open a store in San Francisco, including the notification of

15  neighbors, as well as a review and approval process, possibly involving a public hearing,

16  before the San Francisco Planning Commission.

17

18                            THE SCHEME TO DEFRAUD

19    29.    Between in or around February 2007 through May 2007, in the Northern

20  District of California and elsewhere, the defendant,

21                                EDMUND JEW,

22  did knowingly and intentionally devise a material scheme and artifice to defraud and

23  deprive the people of the Sunset District and the City and County of San Francisco, as

24  well as the Board of Supervisors for the City and County of San Francisco, of their

25  intangible right to his honest services as a member of the Board of Supervisors for San

26  Francisco.

27  //

28  //

INDICTMENT                                6

## MEANS AND MANNER OF THE SCHEME TO DEFRAUD

30.     It was part of the scheme to defraud and deprive that:

(a)     JEW would and did demand and receive cash from owners of certain businesses located in the Sunset District, in exchange for JEW's promising to assist them with their issues with the city licensing process by exerting his official influence over the San Francisco Planning Department and the San Francisco Planning Commission.

(b)     JEW would and did tout his own official power as a San Francisco Supervisor to persuade business owners to enter into a paying arrangement with him and/or his recommended "consultant."

(c)     JEW attempted to influence, and did influence, the recommendations and decisions of the San Francisco Planning Department and the San Francisco Planning Commission, well knowing that he and other members of the Board of Supervisors would preside over any appeals from the Planning Commission, and well knowing that he could vote to overrule any Planning Commission decision brought on appeal to the Board of Supervisors.

(d)     JEW would and did insist that payments be made to him and his "consultant" in cash.

(e)     JEW would and did attempt to disguise the nature of the payments by claiming that the money was intended for a "consultant."

(f)     As set forth below, JEW improperly and unlawfully demanded and extracted cash payments from owners of two different sets of businesses located in the Sunset District: (A) the Irving Street Quickly Store; and (B) Wonderful Foods and Wonderful Desserts & Café.

//

//

//

//

INDICTMENT                                    7

1

**A.     Irving Street Quickly Store**

2      31.    From in or around 1993 until 2007, WONDERFUL OWNER #1 operated

3 Wonderful Foods at 2110 Irving Street in San Francisco. WONDERFUL OWNER #1 leased

4 the premises from LANDLORD #1. This lease was set to expire on March 31, 2007, but

5 WONDERFUL OWNER #1 expected to renew the lease as he had done in previous years.

6      32.    In around February 2007, LANDLORD #1 notified WONDERFUL OWNER #1

7 that LANDLORD #1 would not renew the lease for 2110 Irving Street. Instead, LANDLORD

8 #1 announced that he planned to lease 2110 Irving Street to the QUICKLY OWNERS, who

9 were already operating the Irving Street Quickly Store next door at 2116 Irving Street.

10      33.    In or around February and March of 2007, WONDERFUL OWNER #1

11 requested that JEW assist WONDERFUL OWNER #1 in keeping his lease at 2110 Irving

12 Street. JEW agreed to assist WONDERFUL OWNER #1.

13      34.    On or about March 13 and 14, 2007, WONDERFUL OWNER #1 used six

14 intermediaries to contribute $3,000 to the "Ed Jew for Supervisor" campaign.

15      35.    On or about March 14, 2007, JEW met with PLANNING OFFICIAL #1 and

16 another top official at the Planning Department. JEW brought up the topic of the lease

17 dispute over the retail space at 2110 Irving Street. JEW further supplied Planning

18 Department officials with details about the Irving Street Quickly Store and the Quickly

19 chain. PLANNING OFFICIAL #1 assured JEW that he would personally look into the status

20 of the Irving Street Quickly Store.

21      36.    Later the same day, PLANNING OFFICIAL #1 reported to JEW that all the

22 Quickly franchises in San Francisco appeared to violate the Formula Retail Ordinance.

23 PLANNING OFFICIAL #1 assured Jew: "I'll wait to hear from you before taking any action."

24      37.    JEW sought and obtained several face-to-face meetings with the QUICKLY

25 OWNERS. In the first meeting, JEW informed the QUICKLY OWNERS that the Irving Street

26 Quickly Store was operating illegally in San Francisco. JEW then directed the QUICKLY

27 OWNERS to sublease the space at 2110 Irving Street back to Wonderful Foods for two

28 years. In return, JEW said he would make sure that the QUICKLY OWNERS could legally

INDICTMENT                                 8

1  operate their Quickly franchise at 2116 Irving Street for the same two-year period.

2  38.  The QUICKLY OWNERS said they did not wish to surrender the lease at 2110
3  Irving Street. JEW told them if they wished to keep the lease at 2110 Irving Street, then
4  they would have to pay $20,000 in order to operate legally. JEW said that if they delayed,
5  the price would increase to $50,000. JEW said he would only accept payment in cash.

6  39.  In subsequent meetings, JEW continued to request that the QUICKLY
7  OWNERS make cash payments, ostensibly to secure the services of a "consultant" whom
8  JEW was recommending. Through March and April of 2007, the QUICKLY OWNERS did
9  not pay JEW or his "consultant."

10  40.  In or around April 2007, JEW communicated to PLANNING OFFICIAL #1 that
11  JEW approved of the Planning Department moving forward with issuing Notices of
12  Violation to the Quickly stores for alleged violations of the Formula Retail Ordinance.

13  41.  On or about April 25, 2007, the Planning Department mailed a Notice of
14  Violation citing the Irving Street Quickly Store for violating the Formula Retail
15  Ordinance and requiring corrective or responsive action within fifteen days.

16  42.  The Planning Department also issued Notices of Violation to numerous
17  other Quickly franchises in San Francisco.

18  43.  On or about May 3 and May 4, 2007, JEW met with actual and purported
19  representatives of various Quickly franchises in San Francisco. In those meetings, JEW
20  repeatedly promised to take official actions on behalf of the Quickly stores if they hired
21  and paid JEW and/or the "consultant."

22        (a)  JEW told Quickly representatives that the price would be $20,000
23  per store, but if they were able to round up at least eight franchises, JEW would
24  reduce the price to $10,000 per store.

25        (b)  JEW said that if the QUICKLY OWNERS agreed to pay an extra
26  $2,000, in addition to a $10,000 fee, "there might be a chance" that the Irving
27  Street Quickly Store could avoid a public hearing.

28        (c)  JEW said that if the Quickly matter proceeded to a public hearing, he

INDICTMENT                                    9

1    would talk to Planning Department officials, write letters on Quickly's behalf, and
2    issue a notice. JEW said: "They will listen to the City Supervisor in that district.
3    That's how it usually works."

4         (d)    JEW promised to "stall" the Planning Department and "drag out
5    more time," so that the Irving Street Quickly Store could continue to operate
6    through the profitable summer months.

7         (e)    JEW said he had spoken to Planning Department officials on behalf
8    of the Quickly franchises. Regarding PLANNING OFFICIAL #1, JEW further stated:
9    "I am his boss."

10        (f)    JEW said all decisions by the Planning Department regarding
11   businesses located in the Sunset District had to be submitted to JEW, in his
12   capacity as the Supervisor for that district, for his approval: "They have to pass
13   through me. This is my district."

14        (g)    JEW said he would assist with Quickly franchises not located in the
15   Sunset District by speaking to the Supervisors presiding over those districts.

16   44.    On or about May 7, 2007, JEW met with Quickly representatives at his
17   flower shop. At that meeting:

18        (a)    Quickly representatives confirmed that eight Quickly franchises had
19   each agreed to pay $10,000, for a total payment of $80,000. The Quickly
20   representatives further offered to make an immediate payment of $40,000, with the
21   remaining balance of $40,000 to be paid later.

22        (b)    JEW promised to call a Planning Department employee and persuade
23   him to permit the Irving Street Quickly Store to continue to operate, in spite of the
24   compliance deadline set forth in the Notice of Violation.

25        (c)    JEW again said he would write a letter to the Planning Department
26   on behalf of the Quickly franchises.

27        (d)    JEW accepted $40,000 in cash from the Quickly representatives.
28   //

1    **B.    Wonderful Foods & Wonderful Desserts & Café**

2    45.    On or about March 31, 2007, after failed attempts to convince LANDLORD
3    #1 to change his mind about renewing the lease, WONDERFUL OWNER #1 closed down
4    Wonderful Foods at 2110 Irving Street.

5    46.    On or about April 5, 2007, WONDERFUL OWNER #1 opened Wonderful
6    Desserts & Café at 2035 Irving Street.

7    47.    WONDERFUL OWNER #1 planned for his new dessert store, Wonderful
8    Desserts & Café, to be a sit-down establishment with tables and chairs, instead of a carry-
9    out operation. WONDERFUL OWNER #1 learned, however, that the existing city permit for
10   2035 Irving Street authorized use of the space only for retail, and not for a sit-down
11   restaurant. Accordingly, prior to the opening of Wonderful Desserts & Café,
12   WONDERFUL OWNER #1 applied to the San Francisco Planning Department for
13   conditional-use authorization to operate Wonderful Desserts & Café as a sit-down eatery.

14   48.    In or around March 2007, WONDERFUL OWNER #1 asked JEW for his
15   assistance in securing a conditional-use permit from the San Francisco Planning
16   Commission so that WONDERFUL OWNER #1 could operate Wonderful Desserts & Café as
17   a sit-down establishment.

18   49.    JEW directed WONDERFUL OWNER #1 to hire an unnamed "consultant" to
19   assist with the permitting process. According to JEW, the "consultant" would guide
20   WONDERFUL OWNER #1 through the permitting process and speak on his behalf at the
21   upcoming public hearing.

22   50.    JEW said the "consultant" would cost $5,000. WONDERFUL OWNER #1 told
23   JEW the price was too high, so JEW agreed to reduce the price to $4,000.

24   51.    On or about March 28, 2007, JEW wrote a letter to the San Francisco
25   Planning Department, in JEW's official capacity and on JEW's official Board of
26   Supervisors letterhead, expressing his office's support for the granting of conditional-use
27   authorization to Wonderful Desserts & Café.

28   52.    On or about April 16, 2007, the Planning Department transmitted through

INDICTMENT                                    11

1  the United States mails a notice of a public hearing regarding WONDERFUL OWNER #1's

2  application for conditional-use authorization.

3      53.     On April 25, 2007, JEW wrote a letter to the President of the San Francisco

4  Planning Commission, in JEW's official capacity and on JEW's official Board of

5  Supervisors letterhead, expressing his office's support for approval of WONDERFUL

6  OWNER #1's application for a conditional-use permit.

7      54.     On or about April 26, 2007, following a public hearing, the Planning

8  Commission unanimously voted to approve conditional-use authorization for Wonderful

9  Desserts & Café.

10     55.     On or about April 29, 2007, or shortly thereafter, JEW accepted $4,000 in

11 cash from WONDERFUL OWNER #1.

12                          USE OF THE U.S. MAILS

13     56.     Paragraphs 1 through 55 are realleged as if fully set forth herein.

14     57.     On or about the dates set forth below, in the Northern District of California

15 and elsewhere, for the purpose of executing, and in furtherance of, a material scheme and

16 artifice to defraud and deprive, and in attempting to do so, the defendant,

17                              EDMUND JEW,

18 did knowingly cause the matters and items listed below to be sent and delivered by the

19 United States Postal Service according to the directions thereon:

20

| COUNT | DATE | DESCRIPTION OF MAILING |
|-------|------|------------------------|
| ONE | April 16, 2007 | Notice of Planning Commission public hearing concerning conditional-use authorization for Wonderful Desserts & Café |
| TWO | April 25, 2007 | Notice of Violation from the San Francisco Planning Department to the Irving Street Quickly Store |

All in violation of Title 18, United States Code, Sections 1341 and 1346.

27 //

28 //

INDICTMENT                              12

1  COUNT THREE:  18 U.S.C. § 666(a)(1)(B) (Bribery)

2     58.    Paragraphs 1 through 55 are realleged as if fully set forth herein.

3     59.    In every twelve-month period from March 2006 to the present, the City and
4  County of San Francisco received benefits exceeding $10,000 under federal programs
5  involving grants, contracts, subsidies, loans, guarantees, insurance, and other forms of
6  federal assistance.

7     60.    From in or around March 2007 through in or around May 2007, in the
8  Northern District of California and elsewhere, the defendant,

9                              EDMUND JEW,

10  an elected member of the Board of Supervisors for the City and County of San Francisco
11  and an agent of said local government, did knowingly and corruptly solicit and demand
12  for the benefit of any person, and accepted and agreed to accept, a thing of value, that is:
13  soliciting, demanding, and agreeing to accept cash payments totaling $80,000 from
14  representatives of Quickly USA franchises in San Francisco, and accepting a cash
15  payment of $40,000 from said Quickly franchises, intending to be influenced and
16  rewarded in connection with any business, transaction and series of transactions of the
17  City and County of San Francisco involving anything of value of $5,000 or more.

18     All in violation of Title 18, United States Code, Section 666(a)(1)(B).

19  //
20  //
21  //
22  //
23  //
24  //
25  //
26  //
27  //
28  //

INDICTMENT                              13

1  COUNT FOUR: 18 U.S.C. § 666(a)(1)(B) (Bribery)

2      61.    Paragraphs 1 through 55 are realleged as if fully set forth herein.

3      62.    In every twelve-month period from February 2006 to the present, the City

4  and County of San Francisco received benefits exceeding $10,000 under federal programs

5  involving grants, contracts, subsidies, loans, guarantees, insurance, and other forms of

6  federal assistance.

7      63.    From in or around February 2007 through in or around May 2007, in the

8  Northern District of California and elsewhere, the defendant,

9                     EDMUND JEW,

10  an elected member of the Board of Supervisors for the City and County of San Francisco

11  and an agent of said local government, did knowingly and corruptly solicit and demand

12  for the benefit of any person, and accepted and agreed to accept, a thing of value, that is:

13  soliciting, demanding, accepting and agreeing to accept a cash payment of $4,000 from

14  WONDERFUL OWNER #1, intending to be influenced and rewarded in connection with any

15  business, transaction or series of transactions of the City and County of San Francisco

16  involving anything of value of $5,000 or more.

17      All in violation of Title 18, United States Code, Section 666(a)(1)(B).

18  //

19  //

20  //

21  //

22  //

23  //

24  //

25  //

26  //

27  //

28  //

INDICTMENT                       14

1  COUNT FIVE: 18 U.S.C. § 1951(a) (Extortion Under Color of Official Right)

2      64.    Paragraphs 1 through 55 are realleged as if fully set forth herein.

3      65.    From in or around March 2007 through in or around May 2007, in the

4  Northern District of California and elsewhere, the defendant,

5                              EDMUND JEW,

6  an elected member of the Board of Supervisors for the City and County of San Francisco,

7  did knowingly obstruct, delay and affect, and attempt to obstruct, delay and affect,

8  commerce and the movement of any article and commodity in commerce by extortion, as

9  those terms are defined by 18 U.S.C. §§ 1951(b)(2) and 1951(b)(3), that is: soliciting,

10 demanding, agreeing to accept and accepting cash payments from representatives of

11 Quickly USA franchises, with their consent, induced by wrongful use of fear and under

12 color of official right.

13     All in violation of Title 18, United States Code, Section 1951(a).

14

15 FORFEITURE ALLEGATION: 18 U.S.C. § 981(a)(1)(C) (Forfeiture)

16     66.    Paragraphs 1 through 65 are realleged as if fully set forth herein, for the

17 purpose of alleging forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. §

18 2461(c).

19     67.    Upon conviction of a violation of (A) 18 U.S.C. §§ 1341 and 1346 as

20 alleged in Counts One and Two; (B) 18 U.S.C. § 666(a)(1)(B) as alleged in Counts Three

21 and Four; or (C) 18 U.S.C. § 1951(a), as alleged in Count Five, the defendant,

22                             EDMUND JEW,

23 shall forfeit to the United States all property, real or personal, constituting and derived

24 from proceeds traceable to said offenses, including but not limited to:

25         (a)    $10,000, the unrecovered balance of the $40,000 which JEW

26     accepted from Quickly representatives on or about May 7, 2007, and

27         (b)    $4,000, which JEW accepted from WONDERFUL OWNER #1 on or

28     about April 29, 2007.

INDICTMENT                                15

1    68.    If any of said property, as a result of any act or omission of the defendant:

2          (a)    cannot be located upon the exercise of due diligence;

3          (b)    has been transferred or sold to or deposited with, a third person;

4          (c)    has been placed beyond the jurisdiction of the Court;

5          (d)    has been substantially diminished in value; or

6          (e)    has been commingled with other property which cannot be

7    subdivided without difficulty;

8    any and all interest defendant has in other property shall be vested in and forfeited to the

9    United States, pursuant to 21 U.S.C. § 853(p), as incorporated by 28 U.S.C. § 2461(c) and

10   Rule 32.2 of the Federal Rules of Criminal Procedure.

11

12   Dated:                                      A TRUE BILL.

13   $11/06/07$

14                                               FOREPERSON

15

16   SCOTT N. SCHOOLS
     United States Attorney
17

18

19   BRIAN J. STRETCH
     Chief, Criminal Division
20

21   (Approved as to form: _____ )
                            AUSA MICHAEL LI-MING WANG
22

23

24

25

26

27

28

     INDICTMENT                                  16