# EXHIBIT A

- 1 -
FEDERAL BUREAU OF INVESTIGATION

Date of transcription    06/08/2007

STEVEN GRUEL, 655 Montgomery Street, Suite 1700, San Francisco, California 94112, telephone number (415) 989-1254, e-mail attystevengruel@sbcglobal.net, was interviewed by telephone. After being told the interviewing agents' identities and the purpose of the interview, GRUEL provided the following information:

There is a franchise juice store located on Irving Street, the owner of which speaks little or no English (hereinafter "Victim 1"). Another franchise owner (hereinafter "Victim 2") heard from Victim 1 about a scheme to extort money from Victim 1. Victim 2 in turn telephoned JAYNRY MAK with the information. MAK then contacted LELAND YEE with the information, who in turn contacted STEVEN GRUEL. GRUEL is a former Assistant United States Attorney, so he suggested contacting the FBI with the information.

GRUEL's information is that a person named RONALD CHAN told Victim 1 that her store was "out of code" and would be closed, but that he and others could help. CHAN said he works for the City of San Francisco. However, he left only a hand-written note with his name and telephone number.

At a later date, CHAN and Supervisor ED JEW came back to the store and told Victim 1 that it would cost $20,000 to make the problem go away. JEW told Victim 1 to bring cash to his flower shop.

Victim 1 may have store video available.

Investigation on   05/02/2007   at   San Francisco, CA         (telephonically)

File #  194B-SF-141519 -27                          Date dictated
        SA J. Christopher McDonough:jcm
by      SA Bruce A. Whitten

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;

EJ-002815

# EXHIBIT B

*Law Offices of*
# Steven F. Gruel

FILE COPY

*San Francisco Office*
655 Montgomery Street, Suite 1700
San Francisco, California 94111
Telephone: (415) 989-1253
attystevengruel@sbcglobal.net

*Los Angeles Office*
255 South Grand Avenue, Suite 2708
Los Angeles, California 90012
Telephone: (213) 625-1703

## FEE AGREEMENT & DISCLOSURE / WAIVER

### 1. Identification of Parties

This agreement is made between Steven F. Gruel, Esquire hereafter referred to as "Attorney," and Ed Jew hereafter referred to as "Client."

This agreement is required by the California Business and Professions Code.

### 16. Disclosure and Waiver

Attorney has disclosed to client the fact that he was earlier contacted by an individual(s) regarding the subject matter of this FBI investigation. The individual(s) conveyed to attorney that they had been informed that client was involved in an alleged unlawful attempt to obtain money from a business with respect to a San Francisco Permit. Attorney verbally passed the information onto the FBI. Attorney was not involved in that matter any further beyond that and has no participation or knowledge as to what subsequent events took place.

Client understands this disclosure and hereby waives any and all conflicts that may exist. Attorney and client have also discussed this matter verbally. These discussions and this agreement cannot disclose every possible conflict. Client is free to seek independent legal counsel to discuss this subject of disclosure and waiver, and all subjects of this agreement, if he feels a need for any further legal advice on this matter.

In fact, client is free to seek at any independent legal counsel on this agreement, disclosure and waiver even if you decide to sign the consent below.

Understanding the above, client desires representation by attorney Steven F Gruel.

## 17. Signatures and Dates

The foregoing fee agreement is agreed upon. Additionally, the foregoing Disclosure and Waiver is understood and agreed upon

by _____   Dated: 5-20-07
Ed Jew

by _____   Dated: May 20, 2007
Steven F. Gruel

# EXHIBIT C



United States Attorney
Northern District of California

Michael Li-Ming Wang
Chief, White Collar Crimes Section

450 Golden Gate Avenue, Box 36055
San Francisco, California 94102

Office: (415) 436-6767
Fax: (415) 436-7234

May 28, 2007

BY FACSIMILE AND FIRST CLASS MAIL

Steven F. Gruel, Esq.
Law Offices of Steven F. Gruel
655 Montgomery St, Suite 1700
San Francisco, CA 94111-2633

Re: Representation of Ed Jew

Dear Steve:

I am writing in response to your letter of May 23, 2007, expressing your intention to continue representing Ed Jew, as well as your opinion that you are not a witness in this matter in spite of your role in referring the matter to law enforcement.

You state in your letter that you have obtained a written waiver from Mr. Jew. Please supply me with a copy of that written waiver.

In addition, you state that you have engaged "associate counsel to ensure that any appearance of impropriety will be dissipated." Please supply the name of "associate counsel" and explain what role that attorney had (if any) in the referral of this matter to the FBI.

Thank you.

Sincerely,

SCOTT N. SCHOOLS
United States Attorney

By: _____
MICHAEL LI-MING WANG
Assistant United States Attorney

TOTAL P.04

# EXHIBIT D



**U.S. Department of Justice**

*United States Attorney*
*Northern District of California*

| | | |
|---|---|---|
| Michael Li-Ming Wang<br>Chief, White Collar Crimes Section | 450 Golden Gate Avenue, Box 36055<br>San Francisco, California 94102 | Office: (415) 436–6767<br>Fax: (415) 436–7234 |

June 12, 2007

BY CERTIFIED MAIL; RETURN RECEIPT REQUESTED

Steven F. Gruel, Esq.
Law Offices of Steven F. Gruel
655 Montgomery St, Suite 1700
San Francisco, CA 94111-2633

Dear Steve:

    Please find enclosed the following items:

1. A copy of the receipt for property seized at 118 Waverly Place, San Francisco, as requested in your letter of June 7, 2007

2. Keys to 2450 28th Avenue, San Francisco

    In my letter of May 28, 2007, I requested a copy of the written waiver that you have represented you obtained from Mr. Jew. I hereby renew that request. Absent that waiver, I may be forced to file an ex parte submission concerning your purported representation of Mr. Jew at the appropriate time in the future.

                                   Yours sincerely,

                                   SCOTT N. SCHOOLS
                                   United States Attorney

By:                            
                               MICHAEL LI-MING WANG
                               Assistant United States Attorney

# EXHIBIT E

*Law Offices of*
# Steven F. Gruel

**FILE COPY**

*San Francisco Office*
655 Montgomery Street, Suite 1700
San Francisco, California 94111
Telephone: (415) 989-1253
attystevengruel@sbcglobal.net

*Los Angeles Office*
255 South Grand Avenue, Suite 2708
Los Angeles, California 90012
Telephone: (213) 625-1703

<u>VIA E-MAIL, FAX & U.S. MAIL</u>

June 14, 2007

Michael Li-Ming Wang
Assistant United States Attorney
450 Golden Gate
San Francisco, CA 94102

Re: <u>June 12, 2007 Letter re: Conflict of Interest Waiver</u>

Dear Michael:

I will ask Supervisor Jew whether he will allow me to share his "conflict of waiver" with the federal government at this time. As I mentioned, I do not believe that a "conflict" exists, but nevertheless made the disclosure and obtained his "wavier" merely in an abundance of caution.

Frankly, should the matter arise later on, I wonder whether the protections afforded by under seal submissions and or protective orders is the better approach. I welcome any additional thoughts on this matter.

Sincerely,

Steven F. Gruel
Attorney for Ed Jew

cc  Supervisor Ed Jew
     John T. Philipsborn, Esquire

# EXHIBIT F

*Law Offices of*
# Steven F. Gruel



*San Francisco Office*
655 Montgomery Street, Suite 1700
San Francisco, California 94111
Telephone: (415) 989-1253
attystevengruel@sbcglobal.net

*Los Angeles Office*
255 South Grand Avenue, Suite 2708
Los Angeles, California 90012
Telephone: (213) 625-1703

<u>**VIA E-MAIL, FAX & U.S. MAIL**</u>

July 4, 2007

Michael Li-Ming Wang
Assistant United States Attorney
450 Golden Gate
San Francisco, CA 94102

Re:  <u>**Conflict of Interest Waiver**</u>

Dear Michael:

Pursuant to your request, please find the redacted pages (pages 1, 4, and 5) of my Fee Agreement with Supervisor Ed Jew that contain the Disclosure and Waiver we have discussed.

I do not agree that you are entitled to this redacted document nor do I believe that a conflict exists. Further, I am providing these pages to you without waiving any right(s) whatsoever or conceding to any position on the matter.

I further provide this document to you because of your verbal assurances that this is for law enforcement matters only.

Sincerely,

Steven F. Gruel
Attorney for Ed Jew

cc  Supervisor Ed Jew
    John T. Philipsborn, Esquire

# EXHIBIT G

FD-302 (Rev. 10-6-95)

- 1 -

FEDERAL BUREAU OF INVESTIGATION

Date of transcription  10/02/2007

Dr. Leland Yee, California State Senator, ███████████
███████████████████████████████████████████████████,
███████████████████████████████, was interviewed at his office.
After being advised of the identities of the interviewing agents
and the purpose of the interview, Yee provided the following
information:

   Both Ed Jew (Jew) and Robert Chan (Chan) have worked
for Yee. Jew initially volunteered for Yee during his Board of
Supervisor campaign. When Yee ran for State Assembly, Jew was
hired as a Field Manager to handle Yee's campaign issues.
After winning the election in 1992, Yee hired Jew as his Field
Representative. Jew was a paid California state employee with a
salary of approximately high $20,000 to the low $30,000.

   Yee maintained offices in San Francisco and Sacramento.
Yee originally thought Jew would be working in the Capital
office and in the district. Due to Jew's responsibility to the
flower shop, Jew was unable to work in Sacramento. Jew's
employment with Yee was terminated due to his Jew's inability to
be in the Capitol. Yee stated the relationship ended amicably.
Yee said that he felt bad about having to let Jew go because he
was good at what he did and he had an expectation that Jew would
be working with him for awhile.

   Yee did not have much contact with Jew after he no
longer worked for Yee due to the difficulty in regulating what
you can say outside the office. Yee also felt that Jew was on a
different political path at this point. Jew was a Republican,
business minded and more conservative than Yee.

   In 2002, Jew decided to run for the Board of
Supervisors. Yee endorsed him even though he knew Jew did not
live in his district. Jew lost the campaign to Fiona Ma.
Again, Yee felt bad for Jew because Jew had developed good
relations with individuals in the Sunset District.

   During this campaign, Yee went to Jew's home in the
Sunset. The campaign was run out of his garage.

Investigation on  10/01/2007  at  San Francisco, California

File #  194B-SF-141519-153                             Date dictated  10/02/2007

        SA J. Christopher McDonough
by      SA Katherine L. Russell:klr

EJ-003014

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;

FD-302a (Rev. 10-6-95)

194B-SF-141519

Continuation of FD-302 of __Leland Yee__, On __10/01/2007__, Page __2__

In 2006, Yee decided to run for State Senate. This left an opening for Fiona Ma to run for Assembly and an opening within the Board of Supervisors. Yee knew that Jew wanted to run again. Prior to the election, Yee approached Jew and asked him to come back to work for him. Yee knew that Jew still had a problem with his residency. One of Yee's lobbyist friends and a one time neighbor of Jew advised Yee that Jew had moved in and out of his residence in the Sunset District.

During Jew's second run for office, Yee did not go to Jew's residence. Yee did not endorse Jew during this campaign. Yee knew Jew was disappointed but Yee and Jew never had a private conversation with Jew about why he did not endorse him in the race. Yee and Jew were always cordial when they met in public.

When questioned on Jew's character of honesty, Yee stated that his one concern with Jew was that he was a business person and a man of resources and means. On one occasion, Jew told Yee to let him show Yee "how it's done." Yee did not follow up on Jew's invitation. By inference, Yee took that statement to mean that when given a position of power, it could be used for personal gain. Yee said that the actions may be legal but would be a gray area.

Although Jew knew a lot of people in the City, Jew did not have an unusual amount of influence in the city; primarily because he did not hold a position. Yee was aware that Jew worked on District Attorney Kamala Harris' campaign. Jew was an asset to DA Harris in that he had the ability to organize campaigns.

Yee was not aware that Jew used his contacts for personal gain. Yee thought Jew was more influential when he was an elected official in his own right.

Robert Chan came to Yee's attention through Chan's brother in law, Roland Quan, who has since passed away. Chan was a sporadic volunteer for Yee's Board of Supervisor campaign. Chan's background of working in a non-profit, experience in Washington, D.C, and reference from Roland Quan, made him a good candidate for Yee's office. Chan worked in Yee's Board of Supervisor's office for three to four years on a salary of approximately $50,000. Chan was a very personable individual who tried to be extremely helpful. Yee only had two staffers in

EJ-003015

FD-302a (Rev. 10-6-95)

194B-SF-141519

Continuation of FD-302 of __Leland Yee__ , On __10/01/2007__ , Page __3__

his office and needed his staffers to be as well rounded as possible. Chan was let go from his employment with Yee because he was unable to meet Yee's needs in this regard.

After leaving Yee's employ, Chan went to work for the Chinatown Youth Center as their Executive Director. Chan provided counseling, education and support for troubled Asian youths. Chan was not putting enough time into the youth center and was let go.

Yee was aware that Chan developed his own consulting company, Bridge Consulting. Yee was not sure whether Chan formed the consulting company while still employed with the youth center. Chan attempted to use his relationship with the Board of Supervisors to get favorable recommendations for contracts. Yee advised Chan against doing that.

Yee was not aware of the relationship between Jew and Chan. Yee thought the connection might have been the Chinese American Democratic Club (CADC). Jew was a lot more involved in the CADC than Chan, although Chan was the Director. Yee did not believe that Chan worked on Jew's campaign for Board of Supervisor.

Yee described Chan as a harmless guy that just wanted to be "somebody". Chan would say that he would know a person every two seconds just to seem important. Chan did not have any particular influence within the city.

While working for Yee, Chan never handled money. However, Yee believed Chan handled money while at the Chinatown Youth Center. Yee knew the Board kicked Chan out of the Youth Center but he never heard the full story of why Chan was fired.

The last time Yee spoke with Chan was last year at the Cherry Blossom Festival. Chan was driving the car for Aaron Peskin.

Neither Jew nor Chan has called Yee regarding their current problems. Yee believed Jew was capable of the allegations against him. However, Yee was not quite so sure that Chan was capable of the allegations. As the two characters from "Of Mice and Men", Yee said given the right circumstances, anyone can do anything.

EJ-003016