1  JOSEPH P. RUSSONIELLO (CSBN 44332)
   United States Attorney
2
   BRIAN J. STRETCH (CSBN 163973)
3  Chief, Criminal Division

4  MICHAEL LI-MING WANG (CSBN 194130)
   TRACIE L. BROWN (CSBN 184339)
5  Assistant United States Attorneys

6      450 Golden Gate Avenue Box 36055
       San Francisco, CA 94102
7      Telephone: (415) 436–6767
       Facsimile:  (415) 436-7234
8      michael.wang@usdoj.gov

9  Attorneys for Plaintiff

10
11                       UNITED STATES DISTRICT COURT
12                      NORTHERN DISTRICT OF CALIFORNIA
13                           SAN FRANCISCO DIVISION

14 | UNITED STATES OF AMERICA,       )  No. CR 07-00705 SI
15 |         Plaintiff,              )
                                     )  UNITED STATES' OPPOSITION TO
16 |    v.                           )  DEFENDANT'S MOTION FOR REQUEST
                                     )  FOR EVIDENTIARY HEARING
17 | EDMUND JEW,                     )
                                     )  Date: March 21, 2008
18 |         Defendant.              )  Time: 11:00 a.m.
                                     )
19 | _____ )

20
21
22
23
24
25
26
27
28

OPP. TO D'S REQ. FOR EVIDENTIARY HRG.
CR 07-00705 SI

# TABLE OF CONTENTS

INTRODUCTION .................................................................. 1

FACTUAL BACKGROUND ....................................................... 2

    A.    Jew Contacts The Quickly Stores ...................................... 2

    B.    Allegations Pass From Quickly Store Operators to FBI Through Chain of Hearsay ............................................. 2

    C.    FBI Investigates Allegations of Corruption Scheme ................. 3

    D.    Jew Retains Gruel as Defense Counsel; Government Counsel and Gruel Exchange Correspondence ................................ 4

    E.    Criminal Charges Filed Against Jew ................................. 5

ARGUMENT ..................................................................... 6

    I.    THE APPROPRIATE LEGAL STANDARD IS WHETHER JEW HAS RAISED AN ISSUE OF MATERIAL FACT WHICH, IF RESOLVED IN HIS FAVOR, WOULD ENTITLE HIM TO A DISMISSAL ............................................................. 6

    II.    JEW HAS ALLEGED NO ISSUE OF MATERIAL FACT THAT WOULD SUPPORT A FINDING OF GOVERNMENT MISCONDUCT ...................................................... 7

        A.    Jew's Unsupported Factual Assumptions Concerning Senator Yee Are False ........................................... 8

        B.    Jew's Theory of Misconduct Has No Support in the Case Law .... 9

        C.    Jew Fails to Make Any Showing of Prejudice ................... 11

CONCLUSION .................................................................. 12

# TABLES OF AUTHORITIES

**FEDERAL CASES**

*United States v. Danielson*, 325 F.3d 1054, 1069–70 (9th Cir. 2004) .............. 12

*United States v. Gonzalez-Lopez*, 126 S. Ct. 2557, 2563–65 (2006) ................ 8

*United States v. Irwin*, 612 F.3d 1182, 1187 n.14 (9th Cir. 1980) ............... 7, 12

*United States v. Marshank*, 777 F. Supp.1507 (N.D. Cal. 1991) ................ 11, 12

*United States v. Partin*, 601 F.2d 1000, 1006 (9th Cir. 1979) .............. 9, 10, 12

*United States v. Rewald*, 889 F.2d 836, 858 n.16 (9th Cir. 1989) ................ 10

*United States v. Samango*, 607 F.2d 877 (9th Cir. 1979) ........................ 10

*Wheat v. United States*, 486 U.S. 153 (1988) ................................... 10

**FEDERAL STATUTES**

18 U.S.C. § 1341 ................................................................. 5

18 U.S.C. § 1346 ................................................................. 5

# INTRODUCTION

Defendant Edmund Jew has moved for an evidentiary hearing on the theory that the government improperly failed to investigate and unearth a putative attorney-client relationship between his former defense counsel and Senator Leland Yee, whom Jew characterizes as a "key government witness." (Notice of Motion at 1:25-26.) The Defendant makes clear that he "is not alleging that the government did, in fact, engage in misconduct." Instead, "rather than make misconduct allegations without sufficient evidence," the Defendant "requests an evidentiary hearing to see if there is a basis for a motion to dismiss." (*Id.* at 2:19-22.) Jew's motion is meritless.

*First,* the unsupported and speculative factual assumptions underlying Jew's motion fall far short of raising a material issue of fact, which is required under Ninth Circuit law when seeking an evidentiary hearing.

*Second,* Jew's factual assumptions are demonstrably false. Senator Yee's role in this matter was limited to receiving hearsay from one person and passing it on to someone else; he is not a percipient witness at all, much less a "key government witness." Moreover, no attorney-client relationship ever existed between Senator Yee and Steven Gruel, Jew's former criminal defense counsel.

*Third,* even if Jew's factual assertions were accurate, no legal authority supports Jew's claim that he would be entitled to dismissal of the Indictment in such circumstances. The handful of cases Jew cites are not only distinguishable, the principles for which they are cited appear to have little to do with the "facts" and legal theory offered by Jew here.

*Fourth,* not only does Jew ignore governing case law that requires a showing of "substantial prejudice," he does not and cannot make any showing of such prejudice.

For all of these reasons, the Court should deny Jew's Motion for Request for an Evidentiary Hearing.

//
//

# FACTUAL BACKGROUND

### A.  Jew Contacts the Quickly Stores

On March 14, 2007, Jew, then a member of the San Francisco Board of Supervisors representing the Sunset District, met with two officials from the San Francisco Planning Department. At that meeting, Jew called their attention to the Quickly chain of tapioca-drink shops that were operating at various locations in San Francisco. (Affidavit of J. Christopher McDonough in Support of Criminal Complaint ("Complaint") at ¶¶ 33–35.) Later that same day, one of the Planning Department officials informed Jew that the Quickly stores might be in violation of a San Francisco ordinance imposing restrictions on retail chains seeking to operate in the city. (Complaint at ¶ 36.)

Within days, Jew had tracked down the owner of one of the Quickly stores in his legislative district. (Complaint at ¶¶ 37–45.) On March 19, 2007, Jew met with the store owner and her associate ("Quickly Store Operators") in his City Hall office. At this meeting, Jew informed the Quickly Store Operators that their store violated a City ordinance, and that they needed to pay $20,000 for him to help them address their problem with the Planning Department. (Complaint at ¶¶ 45–53.)

Over the next few weeks, Jew exhorted the Quickly Store Operators to gather other owners of San Francisco-based Quickly franchises. Jew further told them that the price for his services (as well as the services of a "consultant" he had told them to hire) would be $10,000 per store for eight or more stores. (Complaint at ¶¶ 61–67.)

### B.  Allegations Pass From Quickly Store Operators to FBI Through Chain of Hearsay

The Quickly Store Operators, who do not speak English (Complaint at ¶ 18), did not directly report their allegations to law enforcement. Rather, the allegations passed, by way of hearsay, through several individuals before the FBI learned of them:

(1)  The Quickly Store Operators communicated the allegations to another Quickly franchise owner. (*See* FBI Report of Interview With Steven Gruel ("Gruel FBI Interview") (Exh. A to Defense Motion).

(2) The Quickly franchise owner passed the allegations to an individual named Jaynry Mak. (*See* Gruel FBI Interview.)

(3) Jaynry Mak passed the allegations to California State Senator Leland Yee. (Declaration of Leland Yee, PhD. ("Yee Decl.") at ¶ 5.)

(4) Senator Yee passed the allegations to Steven Gruel. (Yee Decl. at ¶ 5.) Yee believed that the FBI should learn about the allegations, but did not know how to make a referral to the FBI. *Id.* Yee knew that Gruel had once served as an Assistant United States Attorney, so Yee believed that Gruel would know whom to contact at the FBI. *Id.*

(5) Gruel reported the allegations to an FBI agent.[1] (Gruel FBI Interview; Declaration of J. Christopher McDonough ("McDonough Decl.") at ¶ 2.)

C.  **FBI Investigates Allegations of Corruption Scheme**

Once the FBI learned of the allegations from Gruel, agents immediately began investigating. The FBI interviewed the Quickly Store Operators and obtained their permission to conduct consensually-monitored conversations with Jew. (Complaint at ¶ 74.)

On May 3 and 4, 2007, the FBI caught Jew on tape touting his influence as a San Francisco Supervisor, demanding cash, telling representatives of the Quickly chain that he would help them "from the inside" by exercising his influence with the Planning Department, and repeatedly telling them they needed to pay him and his selected "consultant" to make their permitting problems go away. (Complaint at ¶¶ 76–91.)

On May 7, 2007, Jew accepted $40,000 in cash from Quickly representatives. (Complaint at ¶¶ 97–104.)

---

[1] Jew contends in this motion that "[t]he FBI 302 makes clear that Gruel presented this information as fact." (*See* Motion at 4:18.) To the contrary, the FBI report actually makes clear that the allegation Gruel was conveying consisted of multiple levels of hearsay.

OPP. TO D'S REQ. FOR EVIDENTIARY HRG.
CR 07-00705 SI                    -3-

On May 18, 2007, the FBI executed search warrants at a variety of locations, including Jew's home in Burlingame, his City Hall Office, his home in San Francisco, and his San Francisco flower shop. (Complaint at ¶¶ 119–21.)

### D. Jew Retains Gruel as Defense Counsel; Government Counsel and Gruel Exchange Correspondence

On May 21, 2007, lead counsel for the United States, Assistant U.S. Attorney Michael Li-Ming Wang, learned that Jew had retained Steven Gruel as counsel in the federal criminal case. (Declaration of Michael Li-Ming Wang ("Wang Decl.") at ¶ 2.)

Later on May 21, 2007, AUSA Wang left Gruel a voicemail saying that Gruel might have a conflict as defense counsel, given that Gruel had played a role in the referral of the matter to the FBI. *Id.*

On May 22, 2007, AUSA Wang wrote Gruel to express concern that he might be a percipient witness, "given [his] role in referring the matter to the FBI." (Wang Decl. at ¶ 3 & Exhibit A). AUSA Wang invited Gruel to explain how he, as a potential witness in the case, could nonetheless represent Jew. *Id.*

On May 23, 2007, Gruel wrote a letter stating that he was not a percipient witness to the investigation, and that his role had been limited to relaying allegations to the FBI from someone else. (Wang Decl. at ¶ 4 & Exhibit B). Gruel further stated that Jew had "orally and in writing waived any conflict of interest" that might arise from Gruel's status as the person who had referred the matter to the FBI. *Id.*

On May 28, 2007, and again on June 12, 2007, AUSA Wang wrote letters to Gruel requesting a copy of the written waiver that Jew had signed. (Exhibits C & D to Defense Motion.)

On June 14, 2007, Gruel responded, indicating that he would seek Jew's permission to share the written conflict waiver, but reiterated his position that no conflict existed. (Exh. E to Defense Motion.)

On July 4, 2007, Gruel provided a redacted copy of his retainer agreement with Jew, which included the waiver.[2] (Exhibits B & F to Defense Motion.) The waiver documented Gruel's disclosure to Jew that Gruel had been contacted by unspecified "individual(s)" who "conveyed to [Gruel] that they had been informed that [Jew] was involved in an alleged unlawful attempt to obtain money from a business with respect to a San Francisco Permit," and that Gruel "verbally passed the information on to the FBI." (Exh. B to Defense Motion.) The waiver also stated that Gruel "was not involved in that matter any further beyond that and has no participation or knowledge as to what subsequent events took place." *Id.* Finally, the waiver stated that Jew "underst[ood] this disclosure and hereby waive[d] any and all conflicts that may exist," and recognized that neither his verbal discussions with Gruel nor the written agreement could "disclose every possible conflict." *Id.*

Both the waiver agreement and Gruel's letter of May 23, 2007, explaining his limited, non-percipient role in contacting the FBI, were consistent with the government's understanding of the facts. (Wang Decl. at ¶ 6.) Recognizing that Gruel would not be a percipient witness, and in the face of a written waiver by a defendant who seemed to have made clear his choice of counsel, the government pursued the matter no further. *Id.*

### E. Criminal Charges Filed Against Jew

On September 20, 2007, a criminal complaint was filed charging Jew with one count of using the U.S. mails in furtherance of a scheme to deprive the public of their right to his honest services as a member of the San Francisco Board of Supervisors, in violation of 18 U.S.C. §§ 1341 and 1346.

Nearly two weeks after the charges were filed, on October 1, 2007, the FBI interviewed Leland Yee for the first time. (Exh. G to Defense Motion.) At no time did Gruel ever have an attorney-client relationship with Leland Yee. (Gruel Decl. at ¶ 4; Yee

---

[2] Notably, Jew himself was cc'd on the June 14 and July 4 letters from Gruel to AUSA Wang, thus undermining Jew's suggestions that the government should have been concerned that perhaps Jew was unaware and did not approve of Gruel's communications with the government on this issue. (*See* Motion at 6:5-6; 9:2-5.)

OPP. TO D'S REQ. FOR EVIDENTIARY HRG.
CR 07-00705 SI                          -5-

Decl. at ¶ 4.) Furthermore, at the time of the interview with Yee, the government had no information concerning even a *possible* attorney-client relationship between Gruel and Yee. (McDonough Decl. at ¶ 5; Wang Decl. at ¶ 7.)

On November 6, 2007, a federal grand jury indicted Jew on public corruption charges. Neither Leland Yee nor Jaynry Mak testified before the grand jury. (Wang Decl. at ¶ 7.) Moreover, because neither Yee nor Mak has personal knowledge of the facts underlying the charges against Jew, they are not expected to be witnesses at trial. (Wang Decl. at ¶ 8.)

Finally, although it is not relevant to Jew's claim that the government improperly interfered with his attorney-client relationship with Gruel, Leland Yee had no relationship with the victims of Jew's extortion. (*Compare* Motion at 7:10-12, 9:23, *with* Yee Decl. at ¶ 7.)

**ARGUMENT**

Jew's Motion rests on both inaccurate factual assertions and a misapprehension of the governing law. For all of the reasons set forth below, he is not entitled to the evidentiary hearing he seeks.

**I.     THE APPROPRIATE LEGAL STANDARD IS WHETHER JEW HAS RAISED AN ISSUE OF MATERIAL FACT WHICH, IF RESOLVED IN HIS FAVOR, WOULD ENTITLE HIM TO A DISMISSAL**

Jew concedes that any misconduct allegations based on the current record would be "without sufficient evidence," but nonetheless requests an evidentiary hearing — including, apparently, the opportunity to cross-examine government counsel — because he wishes "to see if there is a basis for a motion to dismiss." (Notice of Motion at 2:20-22.) Wanting to "see if there is a basis for a motion to dismiss" does not constitute legal grounds for an evidentiary hearing.

An evidentiary hearing is not a discovery tool. There is no legal support for Jew's contention that he is entitled to an evidentiary hearing based upon a speculative hope that the hearing might turn up evidence that would support a motion to dismiss the Indictment. "Evidentiary hearings need *only* be held when the moving papers allege facts with

sufficient definiteness, clarity, and specificity to enable the trial court to conclude that relief *must be granted if the facts alleged are proved.*" See *United States v. Irwin*, 612 F.3d 1182, 1187 n.14 (9th Cir. 1980) (emphases added) (quoting *United States v. Carrion*, 463 F.2d 704, 706 (9th Cir. 1972)).

In *Irwin,* the Ninth Circuit considered whether a district court erred in denying, without an evidentiary hearing, Irwin's motion to dismiss based on alleged government interference with the defendant's attorney-client relationship. The Ninth Circuit noted: "If, in fact, a material issue of fact were raised 'which if resolved in accordance with (appellant's) contentions, would entitle him to relief,' an evidentiary hearing would be required." *Irwin*, 612 F.3d at 1187 (quoting *Wright v. Dickson*, 336 F.2d 878, 881 (9th Cir. 1964)). Finding that the defendant had raised no such issue of material fact, the Ninth Circuit affirmed the district court's denial of Irwin's motion to dismiss without an evidentiary hearing.

Accordingly, in considering Jew's request for an evidentiary hearing, the appropriate inquiry is whether Jew has alleged facts with "sufficient definiteness, clarity, and specificity" such that the Court must dismiss the Indictment if the facts alleged are true. As discussed below, Jew has fallen far short of the mark.

II. **JEW HAS ALLEGED NO ISSUE OF MATERIAL FACT THAT WOULD SUPPORT A FINDING OF GOVERNMENT MISCONDUCT**

Jew's Motion assumes that there was an attorney-client relationship between Gruel and Yee. Jew further speculates that the government committed misconduct by either (1) being aware of the putative attorney-client relationship between Gruel and Yee, and failing to inform the Court of this relationship; or (2) being unaware of the putative attorney-client relationship between Gruel and Yee, and failing to conduct an investigation that would have unearthed both the alleged dual representation and the "political motivations behind these accusations against Mr. Jew." (Motion at 6:24, 7:9.) As explained in more detail below, Jew's factual speculation is false. But even if it were

true, it would still not constitute misconduct requiring dismissal of the Indictment under Ninth Circuit case law.

### A. Jew's Unsupported Factual Assumptions Concerning Senator Yee Are False

Jew's request for an evidentiary hearing rests on the speculative assertions that (1) Senator Leland Yee is a "key government witness"; and (2) Senator Yee and Steven Gruel had an attorney-client relationship, creating a conflict that the government had an affirmative duty to investigate, uncover, and bring to the Court's attention. Both assertions are demonstrably false.

As to the first point, Senator Yee's role in this case was limited to being part of the hearsay chain by which the allegations against Jew were passed from the Quickly Store Operators to the FBI. Senator Yee is not a percipient witness in this matter; he has no first-hand knowledge of any of the facts in this matter. (McDonough Decl. at ¶ 4; Yee Decl. at ¶ 6.) Accordingly, Senator Yee was not called as a witness in the grand-jury proceedings, and the government does not expect him to testify at trial. (Wang Decl. at ¶¶ 7, 8.)

Contrary to Jew's second factual assumption, no attorney-client relationship ever existed between Senator Yee and Gruel. (Gruel Decl. at ¶ 4; Yee Decl. at ¶ 4.) Accordingly, the government could not have breached a putative duty to investigate and unearth a relationship that never existed, even if it were appropriate for the government to get into the business of investigating defense attorneys' privileged relationships.[3]

---

[3] To the extent that a criminal defendant explicitly waives a putative conflict, any government investigation into that conflict runs the risk of coming perilously close to interfering with the defendant's Sixth Amendment right to counsel of his choice. The U.S. Supreme Court has repeatedly recognized the importance and broad implications of a criminal defendant's constitutional right to counsel of his choice; the Court recently held that erroneous deprivation of a defendant's right to counsel of his choosing is a structural error that requires reversal of a conviction even absent a showing of prejudice. *See United States v. Gonzalez-Lopez*, 126 S. Ct. 2557, 2563–65 (2006). Given that the improper disqualification of chosen counsel is a structural Constitutional violation, and

Moreover, there is no basis for Jew's speculation that, had the government "explored the relationship between Mr. Gruel and Mr. Yee, it may have changed the nature of their investigation against Mr. Jew, and ultimately, whether Mr. Jew would have been charged in this case." (*See* Notice of Motion at 2:15-18.) Senator Yee and Jew may well harbor differing views concerning whether Yee harbors any bias against Jew. *Compare* Yee Decl. at ¶ 3 ("I do not consider [Jew] a political enemy or adversary, merely a politician with a different viewpoint than mine") *with* Defense Motion at 2:13-15 (describing Senator Yee as "former political supporter turned adversary of Mr. Jew" who has "personal motives to implicate Mr. Jew"). Jew's personal conspiracy theory regarding Senator Yee is irrelevant, however, given that most of the facts underlying the Indictment — including recordings of Jew making numerous incriminating statements and accepting $40,000 in marked bills — occurred after the referral to the FBI, and thus after Senator Yee's limited involvement in this matter had ended. In the face of such evidence, it strains credulity to suggest that the United States would have declined to charge Jew based on speculation as to the "personal motives" of Senator Yee and Jaynry Mak, individuals uninvolved in the facts of the case.

**B.    Jew's Theory of Misconduct Has No Support in the Case Law**

As noted above, no attorney-client relationship ever existed between Gruel and Senator Yee. But even if there had been such a relationship, Jew provides no legal authority — and the government is aware of none — supporting his theory that the government's failure to investigate or notify the Court of the possibility of dual representation could amount to a constitutional deprivation.

Jew cites three cases, none of which advances his cause. For example, while Jew accurately cites *United States v. Partin*, 601 F.2d 1000, 1006 (9th Cir. 1979), for the

---

that inquiring too deeply into the nature of a relationship between an attorney and a defendant could give rise to a claim of unconstitutional interference with the attorney-client relationship, the government must tread lightly indeed when balancing the possibility of an attorney's conflict of interest against a defendant's right to waive that conflict to secure counsel of his choice.

unremarkable proposition that a defendant has the right to counsel "whose loyalties are undivided," he fails to connect that basic principle to any improper conduct by the government here. (*See* Motion at 9:8.) In *Partin,* the government called in its case-in-chief at trial a surprise witness who was also represented by the defendant's attorney, without the attorney's prior knowledge of any contact between the client-witness and the government. *Partin,* 601 F.2d at 1005-07. Even so, in light of *Partin*'s prior waiver of the possible conflict, the Ninth Circuit held that there was no constitutional violation.[4] *Id.* at 1007. Here, the government took no affirmative act that could be construed as interfering with Jew's right to counsel with undivided loyalties; rather, the basis for Jew's Motion appears to be his incorrect belief that the government took no action where it should have. Neither *Partin,* nor any other case of which the government is aware, supports such a theory.

Similarly off the mark is Jew's citation to *United States v. Samango,* 607 F.2d 877 (9th Cir. 1979). Jew claims that *Samango* held that "even unintentional misconduct may be sufficient" to dismiss an indictment. (*See* Motion at 8:10-11.) What the Ninth Circuit actually stated in *Samango* was: "Although deliberate introduction of perjured testimony is perhaps the most flagrant example of misconduct, other prosecutorial behavior, even if unintentional, can also cause improper influence and usurpation of the grand jury's role." *Id.* at 882. In *Samango,* the Ninth Circuit found that the grand jury "was overreached" by the prosecutor, who presented a transcript of irrelevant and inflammatory testimony for "no other purpose than calculated prejudice," failed to disclose to the grand jury serious issues relating to the "doubtful credibility" of a witness with "a history of extensive drug abuse," and "effectively testified" through extensive leading questions of a witness who

---

[4] Although irrelevant to this Motion, that aspect of *Partin* was somewhat limited by Supreme Court precedent holding that there are some restrictions on a defendant's ability to agree to joint representation. *See United States v. Rewald,* 889 F.2d 836, 858 n.16 (9th Cir. 1989) ("To the extent *Partin* implied that a defendant always may waive his attorney's conflict of interest, it is inconsistent with the Supreme Court's subsequent decision in *Wheat* [v. *United States,* 486 U.S. 153 (1988)].").

was "trying to please and agreed to anything." *Id.* at 881-83. Given the Court's lengthy recitation of the prosecutor's knowing and extensive misconduct, *Samango*'s passing reference to unintentional misconduct with respect to the grand jury is *dictum* that offers no support to Jew here. That neither Yee nor Mak testified before the grand jury underscores the inapplicability of *Samango* here.

Jew also errs in relying on *United States v. Marshank*, 777 F. Supp. 1507 (N.D. Cal. 1991). Jew correctly cites *Marshank* for the principles that the government violates a defendant's constitutional rights when it interferes with the attorney-client relationship, and that the government "'is not entitled to take advantage of conflicts of interest of which Jew and the court are unaware.'" (*See* Motion at 8:6-8; 8:26-9:2 (quoting *Marshank*, 777 F. Supp. at 1519)). *Marshank* involved the government's knowing, active, and extensive use of the defendant's own attorney against him — including having the attorney (as well as several of the attorney's other clients) testify against the defendant before the grand jury, and learning from the attorney exactly where they could find the defendant to arrest him — all while hiding from the defendant and the Court the defense attorney's unethical efforts to aid the government's prosecution. *Id.* at 1515-18. The facts of *Marshank* thus could hardly be more different than those here, where Gruel never represented any witness against Jew, and where there was no government effort to seek a tactical advantage by using Gruel or one of his clients to prosecute Jew.

Accordingly, Jew's novel theory — that the government committed misconduct by failing to investigate or inform the Court of a possible (but non-existent) conflict — finds no support in the law.

### C. Jew Fails to Make Any Showing of Prejudice

Even if Jew had both identified a material issue of fact and raised a cognizable legal theory of misconduct, his motion for an evidentiary hearing still fails because of his failure to identify any "substantial prejudice" from the alleged government interference. Because he makes no showing of prejudice, he cannot succeed on a motion to dismiss, and is therefore not entitled to an evidentiary hearing under *Irwin*.

OPP. TO D'S REQ. FOR EVIDENTIARY HRG.
CR 07-00705 SI                           -11-

The Ninth Circuit has repeatedly confirmed that "improper interference by the government with the confidential relationship between a criminal defendant and his counsel violates the Sixth Amendment only if such interference 'substantially prejudices' the defendant." *United States v. Danielson*, 325 F.3d 1054, 1069–70 (9th Cir. 2004) (quoting *Williams v. Woodford,* 306 F.3d 665, 683 (9th Cir. 2002)). *See also Marshank,* 777 F. Supp. at 1519 (requiring a showing of prejudice on the same type of claim under the Fifth Amendment's due process clause); *Irwin*, 612 F.3d at 1185 ("not all police action which arguably could be called an interference with the attorney-client relationship" violates a defendant's Fifth or Sixth Amendment rights). As the Ninth Circuit has observed: "Substantial prejudice results from the introduction of evidence gained through the interference against the defendant at trial, from the prosecution's use of confidential information pertaining to defense plans and strategy, and from other actions designed to give the prosecution an unfair advantage at trial." *Danielson*, 325 F.3d at 1069 (internal quotations and citations omitted).

Here, Jew can make no showing of substantial prejudice because there was no government interference in his relationship with Gruel at all, let alone any interference that led to an "unfair advantage at trial." *Id.* Furthermore, as Jew now has a new attorney with "undivided loyalties," *see Partin,* 601 F.2d at 1006, he cannot possibly show the substantial prejudice required for dismissal of the Indictment.

## CONCLUSION

Jew's Motion boils down to a complaint that he was unaware that his "known political enemy" had informed Steven Gruel of the allegations that Gruel passed on to the FBI, and that the government failed to notify him of this fact. But this alleged inaction by the government neither constitutes interference with Jew's attorney-client relationship with Gruel, nor does it result in substantial prejudice that would entitle Jew to dismissal of the Indictment. Furthermore, regardless of Jew's personal belief that he is the victim of a "calculated attack" by his political adversaries, he is not entitled to an evidentiary

1  hearing to search for evidence to support a motion that is long on speculation and short on
2  a cognizable legal theory.
3    For the foregoing reasons, the government respectfully requests that the Court
4  deny Jew's Motion.

5                                          Respectfully submitted,

7  Date:  3/11/08                           /s/
                                            TRACIE L. BROWN
8                                           Assistant United States Attorney