Pages 1 - 35

United States District Court

Northern District Of California

Before The Honorable Susan Illston

| | |
|---|---|
| United States of America, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )    NO. CR 07-0705 SI |
| | ) |
| Edmund Jew, | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

San Francisco, California
Friday, April 3, 2009

**Reporter's Transcript of Proceedings**

**Appearances:**

| | |
|---|---|
| For Plaintiff: | Joseph Russoniello<br>United States Attorney<br>450 Golden Gate Avenue, Box 36055<br>San Francisco, California  94102<br>**By:  Tracy Brown, Esquire<br>Assistant United States Attorney** |
| For Defendant: | Law Offices of Stuart Douglas Hanlon<br>179 - 11th Street, 2nd Floor<br>San Francisco, California  94103<br>**By:  Stuart Douglas Hanlon, Esquire<br>Sara Ellen Rief, Esquire** |
| Also Present: | Christina Carrubba, U.S.P.O.<br>Federal Probation Office<br>San Francisco Division |
| *Reported By:* | *Sahar McVickar, RPR*, CSR 12963<br>*Official Reporter, U.S. District Court<br>for the Northern District of California* |

(Computerized Transcription by Eclipse)

1    **Friday**, **April** **3**, **2009**                                  **9:00 a.m.**

2            **THE CLERK:**  Calling criminal 07-705, United States

3    versus Edmund Jew.

4            **MS. BROWN:**  Good morning, Your Honor.

5            Tracy Brown for the United States.

6            **THE COURT:**  Good morning.

7            **MR. HANLON:**  Good morning, Your Honor.

8            Stuart Hanlon for Mr. Jew.

9            And with Sara Rief.

10           **THE DEFENDANT:**  Good morning, Your Honor.

11           **THE COURT:**  Good morning.

12           **THE PROBATION OFFICER:**  Christina Carrubba with

13   Probation.

14           **THE COURT:**  Good morning.

15           Mr. Jew, you have been convicted of one count of 18

16   U.S.C. 1341 and 1346, which is modern deprivation of honest

17   service; one count of 1 U.S.C. 66(a)(1)(b), which is bribery;

18   and one count of 18 U.S.C. 1951, extortion under color of

19   official right.  The pleas -- the convictions were obtained

20   based on your plea of guilty, which was taken on October 10th

21   of last year.

22           I have read and reviewed the pre-sentence report and

23   the sentencing recommendation and the addendum and the

24   Government's sentencing memo and the defendant's sentencing

25   memo with many attached letters and the reports filed under

1  seal and the Government's reply and some CDs that I viewed --

2  some CDs I was provided with.

3          Is that everything?

4           **MR. HANLON:**  I think so, Your Honor.

5          **THE COURT:**  All right.

6          Mr. Jew, did you have an opportunity to read the

7  report that was prepared about you in this case?

8          **THE DEFENDANT:**  Yes, yes, Your Honor.

9          **THE COURT:**  All right.

10         I understand from the paperwork that there are a

11  couple of objections to the report.  The first is that the

12  defendant objects to paragraph 31, which says that $5000 is

13  missing.

14         **MR. HANLON:**  Right. I think I'm working out -- it

15  was given -- I mean, the history of the money is that 10,000

16  was taken, 5000 was -- 10,000 left in the house, 5,000 was

17  given to Mr. Jew's first lawyer; Mr. Gruel gave it to me, and I

18  gave it to the Government.

19         The other 5 was part of a purchase and money order

20  that was tried to be given to a park that was -- I got the

21  money order, cashed it, and I am just working out with the

22  Government a way to tell me where to give it to them.

23         **THE COURT:**  The marked bills are gone, but the money

24  has been reimbursed.

25         **MR. HANLON:**  Right.  I have the -- well, 5000 marked

1   bills, were returned by me to the Government.  The other ten

2   were used by the first lawyer to buy a cashier's check -- the

3   other 5, say 5 of the ten were used to purchase it.  I had the

4   wife, Mr. Jew's wife, who bought the money order, cash it, give

5   me the money, and I'm waiting for the Government to just let me

6   know who to make the check out to return.  Now, whether --

7          **THE COURT:**  The other lawyer used the marked bills

8   to get the money order?

9          **MR. HANLON:**  I think it was marked bills.  I can't

10  speak for that, but that was my understanding.  But that's

11  where the -- the other 5000 marked bills don't exist.  My

12  understanding it was used to purchase a money order which I had

13  cashed and I'm going to return to the Government.

14         **MS. BROWN:**  I actually sent defense counsel an

15  e-mail about how to get that taken care of, so I expect that

16  the restitution will be completed with the payment of the

17  remaining $5000.

18         **MR. HANLON:**  Today or Monday, whatever.

19         **THE COURT:**  All right, so I don't think there is any

20  need to amend the pre-sentence report.

21         **MR. HANLON:**  No.

22         **THE COURT:**  But, it will just reflect that

23  ultimately the restitution was made.  Okay.

24         The next objection is to paragraph 41, defendant

25  objects to the two-level increase in the guideline sentencing

1    calculation based on the victims having been vulnerable

2    victims, in accordance with 2(a)1.1(b) of the guideline rules.

3    I'm inclined to agree with the probation officer; the victims

4    not only didn't speak English, but they were unfamiliar with

5    the City Government processes.

6              It was a new country to them.  It was a different

7    social structure.  They were persuaded to give money to the

8    defendant because he claimed to be working for them and spoke

9    their language and said he could navigate the shoals of City

10   Government for them.  And, they were unfamiliar with all those

11   things.  So, I'm inclined to agree with the probation officer

12   that they are vulnerable victims, although I would be happy to

13   hear from you.

14        *MR. HANLON:*  We've given our arguments to the Court

15   in our briefs; we submit it on that.

16        *THE COURT:*  Thank you.  They are overruled.

17             The defendant objects to the statement that he owns

18   half of the house in Burlingame.

19        *MR. HANLON:*  We -- he clearly does, under California

20   law.  It was transferred in 1991 to his wife, but I was just

21   explaining to him that it doesn't matter. It still is -- so, we

22   agree with the Probation Department.

23        *THE COURT:*  All right, so that's overruled.

24             And finally, the defendant objects to the loss

25   calculation as being $80,000 and contends it should be only 30

1  because it wasn't really 80, he was after, it was 60 and half

2  of that was to go to Mr. Robert Chan.  So, really, it should

3  only be 30.

4          The probation officer's analysis was that under the

5  guidelines, what matters is the intended amount of loss.  And,

6  it appears to me, from the materials I've reviewed, that the

7  intended amount of loss was $80,000.  What he intended to do

8  with it once he had gotten it from the victims is not -- not

9  important for these purposes, so I'm inclined to agree with the

10  probation officer on that as well.

11          **MR. HANLON:**  Your Honor, what I -- what I intend to

12  do to address that when we talk about -- I'm not -- I agree

13  with the analysis the Court has laid out and with the cases,

14  and I'll address why I think it's important in talking about

15  the overall sentence.

16          **THE COURT:**  All right.

17          **MR. HANLON:**  But I agree that the law is quite

18  clear: it's the intended loss.

19          **THE COURT:**  Okay, then that objection is overruled

20  as well.

21          One other thing I'll note with respect to the

22  pre-sentence report is that it doesn't discuss the psychiatric

23  evaluation that was provided by the defendant on account of it

24  wasn't provided to the probation officer prior to the time that

25  this report was drafted.  So, I've read it and considered it,

1  but it's my understanding that it was submitted late.  So it's

2  -- it puts the probation officer at a disadvantage in dealing

3  with the facts of the case.

4       **MR. HANLON:**  Um, I don't wish to argue that issue

5  with the Court, I mean, I wish to -- wish to address it.  I'm

6  glad the Court read it.  We gave it to the probation department

7  as well as the U.S. Attorney, and I will obviously talk about

8  it, but I don't -- the probation officer did a good job.  And

9  there is a lot of information, so --

10       **THE COURT:**  Well, and I did read it.

11       **MR. HANLON:**  Right.  So I'm willing to leave it at

12  that.

13       **THE COURT:**  All right, are there any other

14  objections to the PSR?

15       **MR. HANLON:**  No.

16       **MS. BROWN:**  Your Honor, actually, I just noticed

17  something that is immaterial, to some extent, but just for

18  purposes of clarification:  In paragraph 53, which is the

19  criminal history computation, I just noticed, actually, this

20  morning, and I apologize for not raising this earlier -- that

21  under 4(a)1.2(a)(4) and 4(a)1.1(c), his plea of guilty to the

22  perjury charge in the State Court counts as one criminal

23  history point.  It doesn't change his overall criminal history

24  category, but it does count as a conviction carrying one

25  criminal history point under 4(a)1.2(a)(4), and 4(a)1.1(c).

1          **MR. HANLON:**  I'm not prepared to address it, but it

2     doesn't matter in terms of sentencing and guidelines.  I trust

3     Ms. Brown would not misquote the guidelines.  I haven't looked

4     at them.  She hasn't misquoted them yet, I would assume.

5          **THE COURT:**  Are you content to leave it the way it

6     is since it's not material to the analysis?

7          **MR. HANLON:**  It doesn't change the guidelines

8     calculation.  I just want to say the report maybe should be

9     amended.  We would have no objection to that.

10         **THE COURT:**  Okay, well, then I'll request that

11    happen.

12         **MS. BROWN:**  Again, I apologize for not noticing it

13    earlier.

14         **THE COURT:**  All right, with that one change, then, I

15    accept the pre-sentence report.  I find that the applicable

16    total offense level is 25, the criminal history category is

17    one.  The guideline sentencing range would be 57 to 71 months

18    in custody.  The supervised release guidelines are two to three

19    years.  Probation is not authorized.  The fine guidelines are

20    10,000 to $100,000, and the mandatory special assessment is

21    $300.  Restitution would be $5000.

22         **MR. HANLON:**  I have the money, so it will be

23    resolved, unless I decide to keep it, which is really unlikely.

24              **(Laughter.)**

25         **THE COURT:**  That would be a whole host of other

```
 1   problems.
 2              MR. HANLON:  We are not going to get even near
 3   those.
 4              THE COURT:  Mr. Hanlon is going to provide the
 5   remaining $5000.
 6              THE CLERK:  Okay.
 7              THE COURT:  The probation officer has recommended a
 8   64-month sentence and a $10,000 fine.  The Government has
 9   recommended a 57-month sentence.  And nobody talked about the
10   fine; I take it that that is --
11              MR. HANLON:  Ten thousand is okay.
12              THE COURT:  And the defendant has recommended a
13   sentence of a year-and-a-day.  I will give you my preliminary
14   view, and then I'll be happy to hear from everybody.
15              The Court agrees with the probation officer.  I
16   don't think that this was just a lapse in judgment or a poor
17   decision, which is something that many of the letters reflected
18   and, indeed, Mr. Jew's letter reflected that as well.  I mean,
19   this was a corrupt act that was undertaken.
20              The defendant's letter really seems to me to
21   underscore that he is having a hard time coming to grips with
22   the fact that this was a crime he committed.  There is a lot of
23   blame laid on others.  And, I think, really, the defendant
24   needs to accept his own responsibility for this.
25              He says he had a secret plan to raise money for city
```

```
1   projects, but you don't extort money from your constituents in
2   order to fulfill a secret plan and then put the money in your
3   refrigerator.  I just think this was far more than poor impulse
4   control that we saw here; this was a corrupt act.
5           I wanted to say I read everybody's papers here, and
6   Ms. Brown's reply papers had a statement in them that I thought
7   was a good reflection of what goes on here; she said the
8   decision whether to extort or not to extort money from one's
9   own constituents is simply not a morally ambiguous situation
10  regardless of whether defendant has previously seen other
11  politicians receive other cash donations from supporters.
12          Mr. Jew said that he was relatively naive in the
13  ways of the city, and it is certainly true that these events
14  happened within months of his taking office, but I think it's
15  important for everyone to understand that if he thought this is
16  how things were to be done in this city, this is not the way
17  things are done in this city.  It's important for Mr. Jew to
18  understand that and for everyone else to understand that.
19          There is reference made in the papers to the media
20  attention this has drawn; certainly, there has been a lot of
21  that, and it has to be extremely uncomfortable to bear the
22  brunt of that kind of focus, but the reason the media attention
23  has been focused here is this is public corruption, and it's so
24  important that it not happen, and that if it happens that it go
25  unreported.  So, this is exactly the kind of thing, that it is
```

1   important that the criminal justice process send the right kind

2   of message out to the community that this cannot be tolerated.

3   So -- that's why, in my view, the probation officer got it

4   right, and that would be my plan.

5           So having said all of that, I'll be happy to hear

6   from you, Mr. Hanlon.

7           **MR. HANLON:**  Well, I do have some things to say,

8   Judge.

9           **THE COURT:**  Sure.

10          **MR. HANLON:**  And you can tell that I disagree.  I

11  don't disagree with some things you said.  I agree it's a

12  corruption.  And, I think when you hear from Mr. Jew, he does

13  fully understand what he did and how wrong it was.  And I

14  certainly fully understand.  And I wanted to address it.  So we

15  don't disagree with that.

16          I want to -- one of the things that is so hard, and

17  the Court kind of pointed it out without saying it's hard, is

18  that every time I talk about Mr. Jew, and I don't mean in the

19  media, I mean talking to the Court about the case, it sounds

20  like we are making excuses for what is corrupt action.  And

21  really, it's putting into context.

22          It's not -- it's frustrating as a lawyer, and the

23  Court knows I have been here a while, to try to do your job for

24  a client you believe in, and every time you open your mouth

25  it's, oh, you are making excuses, you are doing this; well, I'm

1   going to talk about it, and I don't believe it's making

2   excuses, I think it's actually the truth about Mr. Jew.

3           And the question we start with, and I -- you know,

4   for what it's worth, I think of all of us here dealing with

5   this, I spent more time with him, which is as it should be, you

6   know?  You obviously couldn't have, and Ms. Brown couldn't

7   have, and the Probation Office spent as much time as she needed

8   to.

9           I spent a lot of time with him, and my question to

10  myself and to him is how does someone in his situation who is

11  basically -- I mean, Mr. Jew is seen as -- put in the media as

12  this sophisticated businessman:  He is a man who got out of

13  school, didn't do well in school, started a business --

14          **THE COURT:**  He got a college degree and an MBA.

15          **MR. HANLON:**  I'm saying he didn't do -- he didn't

16  get high grades.

17          **THE COURT:**  He graduated.

18          **MR. HANLON:**  Okay, he started one business that

19  failed in insurance.  He started a travel agency that failed.

20  The business that worked was that business of his parents'

21  flower shop.  Every other endeavor he took was not successful.

22          He got into politics -- and his financial endeavors

23  of raising money by real estate is something everybody -- not

24  everybody, a lot of people invested money in property in

25  California and in Arizona that made money and now has lost

1    money.  So, this whole idea that he is a very sophisticated

2    businessman is not correct.

3            And, that he got in politics volunteering for other

4    politicians to help.  I mean, there is no other -- he didn't

5    get there saying I'm going to get rich to be a politician.  He

6    started as a small businessman, someone who was raised in this

7    community, in the Asian-American community of San Francisco, to

8    help people.  I mean, there is no other reason Ed Jew started

9    that process.

10           And doing that, he got from that three weeks into

11   this being a corrupt official, extorting money.  And how do you

12   get to that, that's what I want to talk about, how you get

13   there.  Because I think the Court may stay where you are, but I

14   want you to listen -- I know you are going to listen to me.  I

15   want to say these things, and I think they are really important

16   to understanding how this happened.

17           And, let's start with accepting responsibility.  And

18   I want to be blunt:  I think the problem in this case developed

19   started when he did what he did, but I think in the beginning

20   if he had resigned and moved forward and admitted what he had

21   done, this case would have been in a different posture, not

22   that it makes it any less bad, but it would have been seeing an

23   effect of how we approached it.

24           And once I got in the case, Judge, Mr. Jew listened

25   to lawyers, he listened to me, we resigned -- and the whole

1   process with the Government, whether it be Ms. Brown or

2   Mr. Wang, had been trying to resolve it.  Other than one set of

3   motions I felt were appropriate dealing with prior counsel,

4   there has been no attempt to not accept responsibility.  And,

5   when we couldn't reach a deal, a plea bargain, we pled open.

6          So this whole idea of not accepting responsibility,

7   as soon as I became Mr. Jew's lawyer, that is what he did in

8   all courts.  Within a week, he resigned his office, pled guilty

9   in State Court, and then tried to work out a disposition here.

10  So he has accepted responsibility.

11         He will continue -- I think what makes it hard in

12  his statements -- and I agree with the Court, the statements,

13  some of them do not -- don't sound like you are accepting

14  responsibility.  He is being so attacked in the media and he

15  feels his family is taking the brunt of it, he somehow has to

16  speak out for himself.  I agree; hopefully what he is saying

17  today is really from the heart, that he knows.

18         You know, when I first met Mr. Jew, I said to him,

19  you know -- when he was trying to explain why he did this, I

20  said you can take money to give to Mother Theresa, but it's

21  still corruption and it's still embezzlement, and it's still

22  wrong.  And I don't care how you earned it, you can't do that.

23  And I think he understands that.

24         But starting with, you know, accepting

25  responsibility, he does, and I don't mean in the guideline

1   sense, I mean in the real sense.  I'm not talking about points,

2   I'm talking about who he is and how he understands what he did

3   was wrong.

4          I think it's important for all of us, not just for

5   Mr. Jew, because people have to understand his supporters as

6   well.  And there are many of them.  There are many people who

7   still love Ed Jew because he stood up for the little people,

8   which is really kind of hard to talk about when the people who

9   were hurt were little businesses.  And I pointed out the

10  contradiction:  You stood up and got in politics to help small

11  business people, and you your first act, almost, was to go

12  after small business people in a way that was unfair.

13         But, having said that, I know that is where his

14  heart has always been, that's what he wanted to do.  And they

15  still support him.  And they have to understand that he admits

16  what he did was wrong, and you can't do it as a politician, no

17  matter what your reasons.  And you let down the people who

18  support you, the people who voted for you, your family, your

19  friends, and the people, the Government you swore to uphold.  I

20  mean, he understands that and knows, I think, when people hear

21  it from me and from him, the people who support him understand

22  this is not acceptable.

23         But I want the talk about -- this is one of the more

24  difficult ones about how we talk about how this happened.  And

25  I'm just going to lay it out, because I think it's true:

```
 1   Mr. Jew volunteered with politicians to run in their campaign
 2   and help them.  He saw people, constituents, business people,
 3   small and large, give these people money, sometimes with
 4   pressure put on them and sometimes just as a -- basically
 5   saying you are a powerful person, here, we want to donate to
 6   your campaign; we just want to give you cash.  And he saw that
 7   money being used then to put back in the community to make that
 8   person important.
 9              And, you know, it is frustrating because it sounds
10   like we are saying, oh, he learned how to do it the wrong way,
11   he did learn, it's just a contextual way of understanding his
12   crime.
13              THE COURT:  He couldn't have thought that was right.
14              MR. HANLON:  He thought that is the way politics
15   works.  No, obviously, when he didn't tell the truth to the
16   FBI, he knew something was wrong, right?  I mean, Ms. Brown
17   didn't raise that in her brief, and she is probably sitting
18   here waiting to say it in court.  But obviously, you can't know
19   it's right and then lie about it.  If you think it's right, you
20   say, yeah, I did it, you know?  But, he thought it was the way
21   it worked.
22              I'm just -- again, we are not at trial, Judge.  He
23   has pled guilty and admitted everything.  I'm trying to have
24   you as a sentencing judge understand what happened.
25              He had no other contacts with politics.  Think about
```

```
 1   it:  He is a businessman in Chinese-American community.  He
 2   lives his life; he runs these little businesses.  His first
 3   contacts with politics is volunteering for people.  It's the
 4   only way he saw how politics worked.
 5            And I agree, and I think maybe with -- in case
 6   people understand, if it's still going on, it's not the way it
 7   works, and it can't work that way.  That is why we have
 8   reporting law, and that is why people shouldn't give cash, all
 9   these things.  But that is what he did learn.
10            If you don't buy it, then you don't, but I'm telling
11   you, this is what I honestly believe in talking to him ad
12   nauseam about this.  Because I've tried to -- you know, trying
13   to represent someone in this situation, you try to understand
14   what happened, and that is, in my mind, what happened.
15            The second point, and again, there was one article
16   in the paper that called this, you know, the brain freeze
17   defense, the tapioca brain freeze, the brain damage, you know?
18            And it's like, you know, you read it, and, you know,
19   you hate to sound like a fool in court or in the media, and I
20   never feel like one, maybe I should, but I think the Court
21   should understand the way this test happened.  And it really is
22   important, is that Ms. Rief and I spent a lot of time with
23   Mr. Jew, felt there was something off, there was something: it
24   was almost too simplistic, it was not computerized.  The way he
25   talked to us, he was not getting the information in a way and
```

1    putting it out that he really understood it.  And then we got

2    Derik Paulson, *(phonetic)* who helped us with the sentencing,

3    and he spoke to Mr. Jew, and he talked about these head

4    injuries, which I didn't even know about, these serious head

5    injuries.

6            So we did a test, you know?  We didn't do a test to

7    say he -- the brain damage excuse, you know?  This isn't

8    Twinkies, you know?  I'm dealing with a mental defense homicide

9    case in San Francisco, and people still talk about the Twinkie

10   defense.  This is not a brain defense; this is putting in

11   context how this happens, how a man can get information and not

12   compartmentalize it and use it in a way that we expect him to

13   do as an elected official.

14           And I think the report speaks for itself:  It's not

15   an excuse, you know, and it's not -- you know, Ms. Brown talked

16   about the guideline diminished capacity:  I'm just putting it

17   in a context for you to understand.  And, I think it's

18   important, as you judge him, that this really happened.  And he

19   really does have brain problems, and it's clear when you talk

20   to him.

21           I mean, this sophisticated man, his campaign to win

22   was not getting the brain trust of people, it was borrowing

23   money against his house and driving -- going up and down the

24   Taraval bus line talking to people and shaking hands.  That was

25   Ed Jew's campaign, that one in district election with 5000

1   votes.  He won up and down.

2           Now, you can say maybe that's a brilliant move, but

3   it's only in hindsight.  I mean, it's a ridiculous way to run a

4   campaign, but it's the way he sees that you ought to do

5   politics.  And that's what he did.

6           And I think -- you know, the report says you can

7   suffer, it doesn't affect intelligence, the intelligence level

8   of what they are, they are all standard, but it affects your

9   ability to compartmentalize, to get information.  He doesn't

10  have any senses -- the information comes in, and he doesn't

11  analyze it the way I think the rest of us do.

12          And that is all it's there for.  And it's not to

13  say, oh, find him not guilty because he had a brain injury when

14  he was 8.  He had serious, serious brain injuries.  And it's to

15  understand him and not to say he's not guilty, it's to say he

16  doesn't deserve 60 months -- 64 months.  And I'm going to get

17  to that in a moment.

18          I think he is simple-minded, in a sense, not like

19  stupid, just he's simple.  And he does not -- that's the only

20  way I can explain it, Your Honor, he doesn't think the way --

21  when talking to him, the information doesn't come out the way

22  it does with other people I would expect who I've met in

23  politics, whether it be supervisors or mayors or district

24  attorneys or judges and lawyers, it just is different.  And we

25  don't expect that because he looks like he is a politician and

1    he won in office.  It just is different.  I'm sometimes amazed

2    that people who deal with him don't see that.

3         So, I want to talk about one thing, which, again,

4    you may see as excuses, but it's very -- both the probation

5    officer and the U.S. attorney and now you have said we have to

6    set an example, we have to say to the public you can't do this.

7    And whether you say -- I mean, how you pick the time or how you

8    say 64, 57, whatever it is, that is your job.

9         But I have a problem as a lawyer for my client and

10   as an American citizen and person here, I have the hugest

11   respect for this Court.  I think of all the federal judges,

12   I've had cases in front you, and I know Ms. Brown really well,

13   and Ms. Carrubba has been a great probation officer, but

14   somehow I think you are missing the point, which is we have a

15   country, two days ago a U.S. senator, their office, a U.S.

16   attorney said, oh, we made a mistake:  I don't know if he's

17   guilty, Stevens, or not, but I know the perception of the

18   public is he got off because he is a U.S. Senator.

19         I know that we have a treasury secretary who did tax

20   fraud and who did nanny fraud, and he is the second most

21   powerful person in the United States.  I don't know what he

22   did, but I know the perception.  You are talking about

23   perception and what people see.

24         I know that Scooter Libby gets convicted of a very

25   serious crime, and the President of the United States feels

1   it's okay to pardon him.  I know that we can go through all the

2   other -- just one example that came to me today, Julie Lee was

3   convicted in Federal Court, a fundraiser, Kevin Shelley, the

4   politician she raised money for, he wasn't even charged.  Many

5   politicians don't even get charged.

6           The point of this is, if we want to send a message,

7   it's so easy to start with Ed Jew. It's so simple because he is

8   so obvious in what he did; it was so simple the way he did it,

9   he had to get caught -- he didn't have to -- I take that back,

10  but it would be very easy to say let's start with him.

11          And I'm concerned in picking the wrong person --

12          *THE COURT:*  Well, Mr. Hanlon --

13          *MR. HANLON:*  Go ahead.

14          *THE COURT:*  I'll hear the rest of what you want to

15  say --

16          *MR. HANLON:*  Go ahead.

17          *THE COURT:*  But you need to understand one thing:

18  My job today is to sentence Mr. Jew.  I didn't pick Mr. Jew out

19  in order to send a message to anybody, but he is coming in to

20  me, and he's got to be sentenced.  And, I have to think about

21  all the factors that a sentence is supposed to support, and one

22  of them is deterrence, one of them is public recognition of the

23  seriousness of a crime that was committed.

24          That is my job, I cannot shirk that job.  And I

25  can't say that because somebody else got a better deal or

1  shouldn't have been pardoned, I can say therefore I'm not going

2  to do my job when I have to sentence Mr. Jew.

3          So it's not like I picked it.

4          **MR. HANLON:**  Right.

5          **THE COURT:**  This is a job that came to me today,

6  so --

7          **MR. HANLON:**  Yes, Your Honor.  With all respect,

8  that is why you are a good judge, because I know you are going

9  to do that, and I understand that.  But I still, as a lawyer,

10  want to put it in context.  I don't expect you to do anything

11  different than what you think is right.  I'm trying to feed you

12  information to consider, that is all, and I hope it didn't come

13  out any other way.

14          I think when we get all those things together, you

15  know, I'm biased, just like the Government is biased, they want

16  a result, and I know you are not.  I think a sentence of 64

17  months is totally out of line, I really do.  I know Mr. Jew; I

18  think for what he did you can send a message with a lesser

19  sentence.  I don't see -- that, to me, seems unfair to him, it

20  really does.  And I base that on all the things I've said and

21  my experience with other clients who have done really bad

22  things and get off.

23          That is not the issue.  The issue is I understand

24  the issues you have to face, and I just think that that type of

25  sentence or a sentence that that range is really, really not

1    necessary in this context.  And I'm not even suggesting to you

2    what I would do, given I have heard you.

3              You know, it just -- I mean, my mind goes back -- I

4    just want to finish.  You and I, I think one of the first

5    trials was a public corruption trial, right, a DEA agent who

6    was stealing money.  And, I remember talking to you about it --

7    this is why I like my job better than yours, I don't know how

8    you make these decisions, I really don't.  I mean, I was, that

9    case, at least we had a jury involved.

10             These are difficult cases; I understand what you

11   said when you started.  I just think -- I hope you are

12   listening to me -- I know you are listening, I hope I'm making

13   it clear that this is not the sentence he needs.  The public

14   doesn't need it.  People understand -- he is vilified.  The

15   message is out.  He lost his job.  He lost his respect.  His

16   family, they are sick.  You know, he is going to lose

17   everything, you know?

18             Is it more of a message to the world if you give him

19   64 months instead of 48 or 36 or 57?  I mean, I really think

20   that is what you have to look at because I don't think the

21   message is going to go unheard of.  He is going to prison, you

22   know?  He is disgraced.  His career, not his life, but his

23   career is over.  And that is a huge -- you know, again.  It's a

24   huge message to get out there.  So, I would ask you to

25   reconsider your, I guess, your first thought on sentencing.

1    And obviously, the Government is going to speak, and Mr. Jew

2    will speak, but thank you for listening.

3              **THE COURT:**  Ms. Brown.

4         **MS. BROWN:**  Your Honor, as you recognize, these are

5    very serious crimes that the defendant has pled guilty to.  He

6    is not some city clerk who was fixing parking tickets and

7    making them go away for 20 bucks here or there.  This case is

8    particularly egregious because the defendant was a high-ranking

9    elected official who victimized the very people whom he took an

10   oath of office to serve.

11        And, as Your Honor recognizes, when an elected

12   official abuses the public trust, justice demands a substantial

13   sentence to address the gravity of the conduct, to promote

14   respect for the law, and to provide general societal deterrence

15   to other public officials.

16        The sentence here, as Your Honor recognizes, should

17   send a message that there is no excuse for these actions, that

18   society won't tolerate this type of conduct from its public

19   officials, and that those who choose to violate the public

20   trust will face serious consequences.

21        I want to address briefly just a couple of points

22   that Mr. Hanlon just made.  And I agree with him on one point,

23   which is that Your Honor has an extremely difficult job here

24   with this case, and with any case, quite frankly, where an

25   individual stands before you waiting to receive punishment.

1    But, as I pointed out in my reply brief, the defendant's

2    statement does -- his written statement at least does tend to

3    minimize his culpability a little bit.  I'm not going to going

4    over that, and I certainly hope his oral statement will come a

5    little bit up more clean.

6              With respect to this idea that the defendant learned

7    to extort money from people because of seeing other public

8    officials do that, I find that, first of all, surprising.  But

9    likewise, I learn to drive from my mother, and I don't throw

10   her under the bus when I get stopped for speeding, nor do I

11   say, well, look, everybody drives over 55 miles an hour on the

12   freeway.  It's wrong, and the defendant knew it.  And the proof

13   that he knew it is he immediately told lie after lie after lie

14   to the FBI when they went to talk to him.

15             With respect to the issue of the defendant's, you

16   know, childhood injury, certainly, that was a very, very

17   serious accident that he suffered, but I think that the

18   transcripts and the video clips that I provided to the Court,

19   they do not display an individual with brain impairment; they

20   show someone who is able to manipulate city politics and to

21   prey upon his victims' lack of sophistication.

22             So the fact that he suffered a very serious injury,

23   you know, 40 years ago I don't think has any bearing on the

24   actions that he took.  And so I appreciate all the hard work of

25   the probation officer and I appreciate Mr. Hanlon points, but I

1  think Your Honor is on the right track here with the sentence

2  that you are suggesting.

3             **THE COURT:**  Thank you.

4             Anything further, Mr. Hanlon, or shall I --

5             **MR. HANLON:**  Before I do, just one thing I left out.

6  It's not responsive, just a thing that I thought about.

7             I think this is -- it's in our briefs, you

8  understand, that Mr. Jew made statements and other people heard

9  him, that he intended -- the money wasn't to go all in his

10 pocket.  I certainly believe some of it was, and I'm not min --

11 just, it was always the statement it was going to be put back

12 in the community.

13            It's just -- in one sense it's egregious, because

14 it's getting personal power.  I think -- I forget the analogy

15 the Government used, but I liked it in their brief, something

16 about making yourself important.

17            You know, but it's different -- that doing that I

18 think is different in terms of sentencing, not in terms of

19 guilt, whether you use it just to get -- put in pocket and keep

20 it all as opposed to raising -- getting it so you can then

21 reuse it.

22            **THE COURT:**  Well, Mr. Jew said in his letter he

23 wanted to be savior of the programs.

24            **MR. HANLON:**  I think that's a very grandiose view of

25 one's self.  But, I think it's different than saying I'm just

```
 1    going to pocket it and steal from people.  That is the word

 2    that Ms. Brown used.  And there was another one I liked.  But

 3    that was the point I wanted to make, Judge.

 4              THE COURT:  Thank you.

 5              Mr. Jew, did you want to say anything?

 6              THE DEFENDANT:  Yeah.  Thank you, Your Honor.

 7              Your Honor, I would like to deeply apologize.  And

 8    I'm deeply sorry for my actions to this Court, to the people of

 9    San Francisco, to the voters in the Sunset, my former

10    colleagues at the Board of Supervisors, taxpayers, my friends,

11    supporters, family, and especially my wife, who continues to

12    battle breast cancer, and my loving daughter.

13              Both my wife and daughter really suffered the most,

14    especially my daughter, who was teased by classmates and had to

15    transfer out of the first school and has to leave the second

16    school because of poor academic grades.

17              I spent years giving my time to the community by

18    trying to better help people and better our city schools and

19    our Government.  I first would like to point out that I'm not

20    the person the media has portrayed me as, a bad person, I'm not

21    that person.  I'm a simple and naive person.  I was not

22    supposed to win and be supervisor in the Sunset; I surprised

23    many, and even myself.

24              My campaign was taking the streetcar up and down

25    Taraval and Judah and knocking on doors.  What I did was wrong,
```

 1   I know that now.  And I'm sorry and so ashamed.  I offer my

 2   apology to all.  My intentions were not -- were always to help

 3   others, especially those who needed help, and I ended up doing

 4   the opposite.  I can't apologize enough, again.  I am deeply

 5   sorry to everyone for all the pain, and it will never happen

 6   again.

 7            And I thank my attorney, and now my friend, Stuart

 8   Hanlon and partner, Sara Rief for their help.  I also wish to

 9   thank the prosecutor, Tracy Brown, the probation officer,

10   Mr. Joshua Lee, and this Court for doing what they are sworn to

11   do.  God bless us all and this wonderful country of ours.

12            Thank you, Your Honor.

13            **THE COURT:**  Thank you, Mr. Jew.

14            Well, you've both alluded to the fact this is a

15   difficult job, and it is, but -- but it must be done.  I

16   appreciate having heard from all of you.  And I think I will

17   proceed as I had expected to proceed in imposing the sentence.

18            Is there a typo there?

19            **THE PROBATION OFFICER:**  Just only the next, I think,

20   the sentence.

21            **THE COURT:**  "Pursuant to the Sentencing Reform Act

22   of 1984, it is the judgment of the Court that Edmund Jew is

23   hereby committed to custody of the Bureau of Prisons to be

24   imprisoned for a term of 64 months.  This term consists of a

25   term of 64 months on each of counts two, three and five, all

```
1    counts to be served concurrently.

2            Upon release from imprisonment, the defendant shall

3    be placed on supervised release for a term of three years.

4    This term consists of terms of three years on each of counts

5    two, three, and five, all such terms to run concurrently.

6            Within 72 hours of release from the custody of the

7    Bureau of Prisons, the defendant shall report in person to the

8    Probation Office in the district to which the defendant is

9    released.

10           While on supervised release, the defendant shall not

11   commit another federal, state, or local crime, shall comply

12   with the standard conditions that have been adopted by this

13   court, except that the mandatory drug testing provision is

14   suspended, and shall comply with the following additional

15   conditions:

16           The defendant shall pay any restitution, fine, and

17   special assessment that is imposed by this judgment and that

18   remains unpaid at the commencement of the term of supervised

19   release.

20           The defendant shall provide the probation officer

21   with access to any financial information, including tax

22   returns, and shall authorize the probation officer to conduct

23   credit checks and obtain copies of income tax returns.  The

24   defendant shall not open any new lines of credit or incur any

25   new debt without the prior permission of the probation officer.
```

1   The defendant shall not maintain a position of fiduciary

2   capacity without the prior permission of the probation officer.

3           The defendant shall submit his person, residence,

4   office, vehicle, or any property and his control to a search.

5   Such a search shall be conducted by a U.S. Probation Officer at

6   a reasonable time and in a reasonable manner based upon

7   reasonable suspicion of contraband or evidence of a violation

8   of a condition of release.  Failure to submit to such a search

9   may be grounds for revocation.

10          The defendant shall warn any residents that the

11  premises may be subject to searches.  The defendant shall not

12  own or possess any firearms, ammunition, destructive devices,

13  or other dangerous weapons.  The defendant shall cooperate in

14  the collection of DNA as directed by the probation officer.

15          It is further ordered that the defendant shall pay

16  to the United States a special assessment of $300, which shall

17  be due immediately."

18          Is he able to pay that today, Mr. Hanlon?

19          **MR. HANLON:**  Monday.

20          **THE COURT:**  And it is due by Monday, then.

21          "The defendant shall pay to the United States a

22  total fine of $10,000.  This fine consists of $10,000 for each

23  of counts two, three, and five, which shall be due

24  immediately."

25          Can he do that by Monday as well?

1     **THE CLERK:**  $10,000 for all three counts?

2     **THE COURT:**  Yes.

3     **MR. HANLON:**  Can we have, like, till Wednesday for

4  that?

5          Let's say a week from Monday.  I have to talk to his

6  family.  I know they can do it.

7          How about a week from Monday?

8     **THE COURT:**  Is that agreeable?

9     **MS. BROWN:**  That's fine, Your Honor.

10    **THE COURT:**  So it's payable a week from Monday.

11    Which would be?

12    **THE CLERK:**  April 13th.

13    **THE COURT:**  Thirteenth.

14         Is there anything else for now -- oh, surrender.

15    **MR. HANLON:**  We would ask, because of issues with

16 the school, it be June 15th.

17    **THE COURT:**  Is that agreeable to the Government --

18    **MR. HANLON:**  No.

19              **(Counsel confer.)**

20    **MR. HANLON:**  July 1st would be agreeable.

21    **THE COURT:**  Is that agreeable?

22    **MS. BROWN:**  Yes.

23    **THE COURT:**  All right, so you are to surrender,

24 then, on July 1st.

25         Before that time, they should -- they will undertake

1  to tell you where you should report.  And do just what

2  Mr. Hanlon says.  If for any reason you haven't been designated

3  for by that time, report to this building by 2:00 o'clock on

4  July 1st.

5          MS. BROWN:  Your Honor, I think just to make sure

6  the judgment is perfectly accurate, I think the restitution

7  should be ordered and put in the J & C with the understanding

8  that it's going to be paid, you know, next week, or something.

9          MR. HANLON:  That's fine.

10          MS. BROWN:  The $5000.

11          MR. HANLON:  As soon as I read the e-mail from the

12  Government, that will be paid.  Direct me to pay it.

13          THE COURT:  It is further ordered that the defendant

14  shall pay the restitution to the U.S. Department of Justice,

15  FBI, in the amount of $5000, which shall be due immediately.

16          MR. HANLON:  Right, that's fine.

17          THE COURT:  Okay.

18          THE CLERK:  So, I should put the address.

19          THE COURT:  At this address.

20          THE CLERK:  By when?

21          MR. HANLON:  The 5000.

22          THE CLERK:  Yeah.

23          MR. HANLON:  It's going to be paid to the U.S.

24  Attorney's Office, right?

25          THE CLERK:  It's actually payable to the FBI.

1        **MR. HANLON:**  I'll pay it by --

2        **THE CLERK:**  I think our financial office is involved

3   at some point.  So, I'm making sure I have an address.

4        And I need a due date.

5        **THE PROBATION OFFICER:**  If it's ordered as

6   restitution, you have to pay it through the Clerk's Office.

7        **MR. HANLON:**  Wednesday it's going to be made to the

8   Clerk of the United States Court.

9        **THE WITNESS:**  Wednesday, meaning April 8th?

10       **MR. HANLON:**  The $5000, right.

11       **THE CLERK:**  April 8.

12       **MR. HANLON:**  And it's going to be made out to the --

13       **THE CLERK:**  The judgment will tell you exactly how

14  to pay it.

15       **MR. HANLON:**  Thank you.

16       **THE DEFENDANT:**  It is in there.

17       **MR. HANLON:**  Okay, that's fine.

18       **THE COURT:**  Anything else for today?

19       **MR. HANLON:**  Oh, Your Honor, could we have a

20  recommendation -- I know it's not binding, that somewhere near

21  the Bay Area, if possible, and a camp somewhere near the Bay

22  Area?

23       **THE COURT:**  Any objection to that?

24       **MS. BROWN:**  No, Your Honor.

25       **THE COURT:**  All right.

```
1              I do recommend that you be assigned to some place
2    near the Bay Area so you can be close to your family.
3              MR. HANLON:  And the camp?  Would the Court
4    recommend a camp?
5              THE COURT:  That is up to the BOP.
6              MS. BROWN:  And, Your Honor, with that the
7    Government moves to dismiss the remaining counts in the
8    indictment, which are counts one, four, and six.
9              THE COURT:  All right, that motion is granted.
10             Thank you.
11             Good luck to you, Mr. Jew.
12             THE DEFENDANT:  Thank you, Your Honor.
13             THE COURT:  You're welcome.
14                  (Proceedings adjourned at 11:54 a.m.)
15
16
17                       ---oOo---
18
19
20
21
22
23
24
25
```

<u>**CERTIFICATE OF REPORTER**</u>

      I, Sahar McVickar, Official Court Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings were reported by me, a certified shorthand reporter, and were thereafter transcribed under my direction into typewriting; that the foregoing is a full, complete and true record of said proceedings as bound by me at the time of filing.  The validity of the reporter's certification of said transcript may be void upon disassembly and/or removal from the court file.


                   **/s/ Sahar McVickar**
         _____
          **Sahar McVickar, RPR, CSR No. 12963**
             **Friday, April 17, 2009**